CLEAR CREEK OIL & GAS COMPANY v. FORT SMITH SPELTER
COMPANY.

Opinion delivered April 18, 1921.

1. PUBLIC SERVICE COMMISSION—REVIEW OF ORDERS.—Under Acts 1919, p. 411, the Corporation Commission acted in a *quasi*-judicial capacity in the matter of public utility rates, and its orders affecting property rights are subject to review by the courts in such manner as may be prescribed by the Legislature.

2. CONSTITUTIONAL LAW—PUBLIC UTILITY—PREFERENTIAL CONTRACTS.—If a company incorporated to supply gas was not a public utility at the time of contracting with smelting companies to furnish them gas, giving them a preferential right to be supplied, and the contracts were not entered into in anticipation of the company becoming a public utility, but were merely private undertakings concerning a subject-matter over which the State had no control, such contracts were valid, and the obligations thereof could not be impaired by any State regulation.

3. GAS—IMPAIRING OBLIGATIONS OF CONTRACTS.—An oil and gas company not a public utility could not impair the obligations of its own preferential contract to furnish gas, valid at the time of its execution, by subsequently engaging in the operation of a business subject to the State's control.

4. GAS—AUTHORITY TO OPERATE AS PUBLIC UTILITY.—Where a gas company by its charter was authorized to operate as a public utility in the production, transportation or sale of natural gas, but was not limited to such operation, and was not bound so to operate, and it elected not to do so, it could enter into preferential private contracts not subject to public control or regulation.

5. CORPORATIONS—LEGISLATIVE CONTROL.—It is not within the power of the Legislature to declare the operation of a business which is private in its nature to be public service and subject to public control.

6. GAS—GAS COMPANY AS PUBLIC UTILITY.—A gas company authorized by its charter to operate as a public utility, but not bound to do so, did not become such by virtue merely of Crawford & Moses' Digest, § 3969, empowering public utilities to exercise the power of eminent domain, the company having done nothing pursuant to the terms of that statute or in any other respect to make itself a public utility.

7. EMINENT DOMAIN—PRIVATE BUSINESS.—The Legislature can not confer on a private business the power of eminent domain, which can be exercised solely for the benefit of the public.

8. EVIDENCE—MATTER OF COMMON KNOWLEDGE.—It is a matter of general knowledge that natural gas is a commodity which is usually developed for the purpose of distribution to the public.

9. GAS—CONTRACTS IN CONTEMPLATION OF BECOMING PUBLIC UTILITY. —Preferential contracts by a gas company to supply natural gas to several smelting companies, though executed before the gas company began operating as a public utility, *held* to have been made in contemplation of operation as a public utility by the gas company, and therefore to be subject to regulation by the Corporation Commission.

10. APPEAL AND ERROR—PRESUMPTION IN FAVOR OF JUDGMENT.—On appeal from a judgment of the circuit court dismissing a petition by a gas company to fix a new schedule of rates for the use of natural gas, there is no presumption that the lower court found the old rates to be reasonable; such judgment being based on the erroneous conclusion that the preferential contracts between the gas company and the appellees were beyond the control of the Corporation Commission.

Appeal from Pulaski Circuit Court, Second Division; *Guy Fulk*, Judge; reversed.

*Hill & Fitzhugh*, for appellant.

The record shows that the Corporation Commission was right, and the court erred in dismissing the petition, and the order of the commission should be placed in force. Appellant was a public service corporation from the beginning, and all these parties dealt with it as such, subject to the rights of the State to regulate the rates made by it. 176 Cal. 499; 169 Pac. 59; 251 U. S. 228. Condemnation proceedings can not be had in favor of a private use; the right must be public. 57 Ark. 359; 64 *Id.* 357; 97 *Id.* 86; 97 *Id.* 495; 99 *Id.* 61. The right of taking property by eminent domain may be conferred upon a pipe line company constructing a pipe for oil or gas. 1 Wyman on Public Service Corp., §§ 59, 71; 176 Cal. 499. Under act 911 any corporation engaged in transmitting oil or gas in pipe lines is deemed a pipe line company and as such is assessed for taxation by the Arkansas Tax Commission. C. & M. Dig., §§ 3969 to 3970. Under the Arkansas laws appellant was a public service corporation. 94 U. S. 155; *Ib.* 162; 219 U. S. 467; 34 L.

R. A. (N. S.) 671; 248 U. S. 372; 39 Sup. Ct. Rep. 117; 105 Atl. Rep. 551; act 571, Acts 1919, § 5; 100 S. E. Rep. 551; P. U. R. 1920 C, 160 to 183; *Ib.* 1919 D, p. 252; *Ib.* 1920 E, 911; 4 S. C. Rep. 170. See, also, 9 Am. Law Rep. Ann., p. 1165; 56 Ore. 468; 229 U. S. 397.

If the Clear Creek Company was not a public service corporation at the time it made the contracts in question, it was such at the time the Corporation Commission made the order regulating the rates in lieu of the contract rates. 175 Pac. 466 does not sustain appellees in their contentions. See 251 U. S. 228, which is in point.

*Daily & Woods* and *Mehaffy, Donham & Mehaffy,* for appellees.

The Clear Creek Company was not a public service corporation at the time of the execution of the contracts. Cases in 169 Pac. Rep. 59, 61-2 are not in point. 175 Pac. 466.

The contracts between respondents and the Clear Creek Company were purely private contracts and not subject to control, and the order of the Corporation Commission was a legislative act prohibited by our Federal and State Constitutions. 211 U. S. 210, 53 Law Ed. 150. The establishment of a rate is the making of a rule for the future and a legislative act not judicial in kind. If the Clear Creek Company was a public service corporation when we contracted with them, the State had the right to regulate it, and the State had no power to impair the obligation of a contract between purely private parties. The Corporation Commission has wholly misinterpreted its powers under the act creating it. The findings of the circuit court on conflicting evidence are very persuasive at least. 125 Ark. 138. The findings are not against the clear preponderance of the evidence and should be sustained. 120 *Id.* 118. On the whole case, both on the law and facts, the judgment is right.

McCULLOCH, C. J. Appellant is a domestic corporation, organized for the purpose of "sinking wells, bor-

ing for, providing and transporting crude oil and natural gas, coal, asphalt and any other minerals which may be found in the development of their property," and, asserting itself to be a public utility in the operation of its business of producing, transporting and distributing natural gas, it filed its petition before the Arkansas Corporation Commission on May 13, 1920, praying that a new schedule of rates for the use of gas by smelters and other like consumers be fixed at ten cents per thousand cubic feet. Appellant also filed a petition against appellees, Fort Smith Spelter Company, Arkansas Zinc & Smelting Corporation and Athletic Mining & Smelting Company, three corporations who are customers of appellant as consumers of gas in manufacturing plants, praying for modification of the contracts with appellees for supplying gas, and the latter filed their response in the proceedings before the commission in which they claimed that appellant was not a public utility, and that they (appellees) were receiving gas from appellant under private contracts which were not subject to control by the commission. There was a hearing before the commission, the result of which was that the petition of appellant for the regulation of rates was granted by the commission over the protests of appellees, but the rate was fixed on a graduated scale according to the amount of gas consumed, and the rate so fixed is approximately nine cents per thousand cubic feet. Appellees then carried the proceedings before the circuit court of Pulaski County by appeal as provided in the statute creating the Arkansas Corporation Commission and regulating its proceedings (Acts 1919, page 411), and on the hearing in that court there was a general finding against appellant on the petition and by the judgment of the court the petition was dismissed. An appeal has been prosecuted to this court.

Section 27 of the act referred to provides that there may be an appeal to the circuit court from orders and decisions of the commission, and that said circuit court shall have the power to "vacate or modify any such order found unreasonable or unlawful, or contrary to the evi-

dence; but no new evidence may be adduced by either party in said court, it being hereby expressly made the duty of all parties to present to the commission all evidence on which they may wish to rely in the event of an appeal to the said circuit court, and all appeals shall be tried upon the record made in the proceedings before the commission.''

Section 28 of the act provides for an appeal to the Supreme Court, and that on the hearing of such appeal ''the Supreme Court shall be governed by the procedure, and reviewed in the manner which is now or may hereafter be prescribed by law governing appeals from chancery courts.''

We need not concern ourselves about the particular form of the remedy prescribed by the statute, for that question is not discussed here by counsel. It is sufficient merely to observe that the commission acts in a *quasi*-judicial capacity, and its orders affecting property rights are subject to review by the courts in such manner as may be prescribed by the Legislature. The name given to the method of review by the Legislature is not important, since it is clear that the purpose of the statute was to provide for a review by the circuit court on the record made before the commission, and also provide for an appeal to this court, which latter provision is merely declaratory of the right of appeal conferred by the Constitution.

The real point of the controversy between the parties is whether the contracts between appellant and appellees for the sale and purchase of gas were executed by appellant when it was not acting in any public capacity, as contended by appellee, or whether appellant was from the start a public service corporation and the contracts attempted to confer preferential rights to appellees as consumers. Learned counsel for appellees candidly concede that, if appellant was organized as a public service corporation and at the time of the execution of these contracts it was operating as such public utility in the production and distribution of gas, the contracts were

void, so far as they undertook to confer special privileges upon appellees, and that the schedule of rates for prices of gas is subject to control by the Corporation Commission, even though the statute authorizing such regulations was not passed until after the contracts were executed. It is unnecessary, therefore, to cite authorities on that question. Such authorities are cited on the briefs of counsel.

There is little, if any, conflict in the testimony, so far as we regard it as material.

Appellant was organized as a corporation in July, 1914, for the purposes already recited in the foregoing quotation. Soon after its incorporation, it acquired leases on a large body of land (30,000 acres or more) in Crawford County, Arkansas, and began explorations for gas. This was in what subsequently became known as the Kibler field, and appellant brought in its first well in November, 1915, with the initial capacity of 12,000,000 cubic feet per day. It had no market for its gas at that time and was seeking a market. Fort Smith and Van Buren, the only two cities of any considerable size in that locality, were already being supplied by a gas distributer which obtained gas from another field. Appellant began negotiating with persons who were seeking locations for manufacturing plants and made its first contract with two individuals, Buck and Kerr, who were succeeded in their rights under this contract by appellee Fort Smith Spelter Company. This contract was in writing, duly executed on March 17, 1916.

The contract is lengthy, and provides, in substance, that appellant should proceed to develop the gas field in which it had leases on approximately 30,000 acres and expected to procure more leases, and furnish the contracting parties with gas to be used in a smelting plant to be thereafter located at South Fort Smith, the price to be paid for the gas being specified at four cents per thousand cubic feet; and further provided that, after the first 160 days from the date of the contract, appellant would furnish thereunder gas in quantities which the con-

tracting consumers were to receive up to 5,000,000 cubic feet per day, and that the said parties should have the right to increase the amount up to 12,000,000 feet a day. It provided that the contracting purchasers should "have the first call upon the gas" produced by appellant from any lands in the counties mentioned, or any other territory which might be acquired by appellant, and that the rights of said parties to be supplied with gas should be prior and superior to any contract or agreement made by appellant with others.    There is also a clause in the contract giving the contracting purchasers the right to regulate the percentage flow of gas.    Another clause in the contract worthy of mention provides that, if the plant of the contracting purchasers should cease to yield a reasonable profit of six per cent. on the capital invested, appellant should make a reasonable reduction on the price of gas, and that, if appellant should sell any gas to any other consumers, except churches, schools, hospitals or charitable institutions, "at a less rate of price than governs this contract, then in such event second party shall pay for all gas consumed on a price basis equal to such lower price or prices during the entire time they are in effect."    Still another clause provides that in case of loss by the contracting purchaser on account of fire, explosion, storm, strikes, etc., said party should not be required to accept or pay for any more gas than was actually consumed.

At the time of the execution of this contract appellant had still only one well, but it proceeded thereafter with the further development and up to September, 1916, had brought in ten wells in the Kibler field.    It had not contracted with any other person or corporation for the furnishing of gas, but it had obtained franchises from the incorporated towns of Alma, Conway and Clarksville to furnish gas to the inhabitants of those towns.    It is not shown that appellant operated under these franchises, and they appear to have been subsequently abandoned.    The Kibler field was situated northeast of the city of Van Buren, and the plants of appellees were, un-

der their contracts, to be located, and were subsequently located at South Fort Smith, a suburb on the south side of the corporate limits of the city of Fort Smith except the plant of appellee, Arkansas Zinc and Smelting Corporation, which was established near Van Buren. In order to transport the gas from the field to the location of these plants it was, of course, necessary to lay pipe lines, and appellant constructed a ten-inch line from the field to the plant of appellee, Arkansas Zinc and Smelting Corporation, thence through Van Buren to Fort Smith and through that city to the suburb on the south where the manufacturing plants were located, a distance of about twenty miles from the gas fields. Appellant obtained franchises from the cities of Van Buren and Fort Smith on March 25, 1916, and April 3, 1916, respectively, to distribute and sell gas to the inhabitants of those cities.

The contract between appellant and appellee, Arkansas Zinc & Smeltering Corporation, was executed on May 3, 1916, but it is shown that the negotiations were begun much earlier and resulted in a written memorandum concerning the terms of the contract as early as March 17, 1916, the formal contract being reduced to writing and signed by the parties on May 3, 1916. In this contract it is provided that the purchasing contractor should advance funds to appellant in the sum of $45,000, to be used in the construction of a pipe line, and that said purchaser should, subject to the prior contract with the Fort Smith Spelter Company, have the next call for gas produced by appellant and supplied through the pipe line, at the same price as that specified in the contract with the spelter company. Appellant entered into a similar contract with appellee Athletic Mining & Smeltering Company, dated November 8, 1916, subject to the prior contracts with the other appellees. Under these contracts the Fort Smith Spelter Company has been taking gas at the rate of 3,800,000 cubic feet per day; the Arkansas Zinc & Smelting Corporation had been taking gas at the rate of from 1,250,000 to 1,500,000 cubic feet per day, and the Athletic Mining & Smeltering Company had been taking

gas at the rate of from 3,500,000 to 4,000,000 cubic feet per day. As the Kibler field became depleted, according to the proof, an adjoining field, only a few miles distant, known as the Williams field, was developed, and appellant brought in its first well in January, 1919, and subsequently brought in other wells in that field, and has been furnishing gas to its customers from both fields. Appellant subsequently made contracts with nineteen other manufacturing plants at Fort Smith, but the parties to those contracts have not intervened in these proceedings.

The testimony adduced by appellant tends to establish the fact that the rate specified in these contracts with the parties mentioned is not remunerative, and the evidence is sufficient to support the finding of the commission fixing the rate at approximately nine cents per thousand cubic feet for use by the manufacturing plants. The circuit court made no finding as to the reasonableness of the rate charged. Its ground for dismissing appellant's petition was necessarily based on the conclusion of that court that under the evidence these contracts were controlling and could not be abrogated by any regulations of the Corporation Commission.

If appellant was not a public utility at the time these contracts with appellees were entered into and the contracts were not entered into in anticipation of appellant becoming such a public utility, but were merely private undertakings concerning a subject-matter over which the State had no control, then such contracts were valid, and the obligations thereof could not be impaired by any State regulation. Neither could appellant impair the obligations of its own contract valid at the time of its execution by subsequently engaging in the operation of business subject to the State's control. To permit that would be to allow the impairment of the contract by indirection, which could not be directly done. We are not aware of any authorities holding to the contrary on this proposition, and we deem it unnecessary to cite any authorities in support of it.

It was within the charter rights of appellant to operate a business as a public utility in the production, transportation or sale of natural gas, but it was not limited to such operations as a public utility and was not bound to so operate.   It was authorized to do business in the production, transportation or sale of the commodities named, other than as a public utility.   The question, therefore, is not merely whether appellant was authorized to operate as a public utility, but whether it elected to do so under the power thus conferred.   It had a right to exercise those powers or not to do so, and, in the event of its election not to do so, it could enter into private contracts not subject to public control or regulation.   In other words, appellant was not necessarily a public utility because its charter authorized it to become one in the operation of its business, nor was it under its charter a public service corporation merely by the operation of a private business of the kind enumerated.

Section 1 of a statute of this State, enacted by the General Assembly of 1905 (Acts of 1905, page 577, Crawford & Moses' Digest, section 3969), reads as follows:

"Pipe lines—right-of-way.   Any corporation organized by virtue of the laws of this State, for the purpose of developing and producing mineral oil, or petroleum, or natural gas in this State, and marketing the same, or transporting or conveying the same by means of pipes from the point of production to any other point, either to refine or to market such oil, or to conduct such gas to any point or points to be used for heat or lights, may construct, operate and maintain a line or lines of pipes for that purpose along and under the public highways and the streets of cities and towns, with the consent of the authorities thereof, or across and under the waters and over any lands of the State and on the lands of individuals, and along, under or parallel with the rights-of-way of railroads, and the turnpikes of this State; provided, that the ordinary use of such highways, turnpikes and railroad rights-of-way be not obstructed thereby, or the navigation of any waters impeded; and that just com-

pensation be paid to the owners of such lands, railroad rights-of-way, or turnpikes, by reason of the occupation of such lands, railroad rights-of-way, or turnpikes by the said pipe line or lines.''

It will be observed that this statute does not declare that corporations organized for the purposes mentioned therein shall be public utilities. It does not undertake to classify them as such, but merely provides that corporations organized for those purposes may construct, operate and maintain a line or lines of pipes for that purpose along and under public highways, etc.,'' and may exercise the right of eminent domain for the purpose of condemning property to be used as a right-of-way. The purpose of the statute was merely to confer the right of eminent domain on a class of corporations when operating as public utilities which had not theretofore possessed such right. The purpose of the act, declared in the caption, is ''to confer the right of eminent domain upon companies developing the mineral oil and natural gas resources of the State.'' It is not within the power of the law makers to declare the operation of a business which is private in its nature to be public service and subject to public control. That was so decided by the Supreme Court of the United States in the case of *Producers' Transportation Co.* v. *R. R. Commission,* 251 U. S. 228. In that case the court said: ''It is, of course, true that if the pipe line was constructed solely to carry oil for particular producers under strictly private contracts and never was devoted by its owner to public use, that is, to carrying for the public, the State could not, by mere legislative fiat or by any regulating order of a commission, convert it into a public utility or make its owner a common carrier; for that would be taking private property for public use without just compensation, which no State can consistently do with the due process of law clause of the Fourteenth Amendment. * * * On the other hand, if in the beginning or during its subsequent operation the pipe line was devoted by its owner to public use, and if the right thus extended to the public

has not been withdrawn, there can be no doubt that the pipe line is a public utility and its owner a common carrier whose rates and practices are subject to public regulations.''

This was said in a case involving a statute of the State of California in many respects similar to our own statute quoted above, and the Supreme Court of California announced the same conclusion in regard to this statute as was later declared by the Supreme Court of the United States. (*Producers' Transportation Company* v. *Railroad Commission of California,* 176 Cal. 499.) The California court in disposing of the matter in that case said: ''Neither by the provision of the act in question nor the provision of the Constitution can the State subject private property to a public use, nor confer authority upon the Railroad Commission to assume control of private pipe lines engaged in the transportation of crude oil. Neither by act of the Legislature nor by declaration of the State Constitution can private property be taken for public use without compensation therefor. * * * Where, however, the owner of property voluntarily devotes it to a public use, he in effect grants to the public an interest in such use, and to the extent of the interest so devoted to the public, the public may insist upon a voice in the control and regulation thereof.''

The same principle was, in substance, announced by the Supreme Court of the United States in the case known as the *Pipe Line Cases,* 234 U. S. 548. In that case there was involved the interpretation of an act of Congress extending the authority of the Interstate Commerce Commission over persons and corporations ''engaged in the transportation of oil or other commodity, except water and except natural or artificial gas, by means of pipe lines,'' and the court decided that the Standard Oil Company was subject to that provision as a public carrier, notwithstanding the fact that it only transported oil which under its own requirements was to be sold to itself by the producer. The court decided, however, that another corporation which only trans-

ported oil from one State to another.through its own pipe lines from its own well to its own refinery was not a common carrier within the meaning of that statute.

Our conclusion is, therefore, that appellant did not become a public utility merely by force of the statute itself, without anything being done pursuant to the terms of that statute or in any other respect to make itself a public utility. But the conclusion is inevitable from the proper construction of the statute that, if a corporation organized for the purposes of carrying on the business mentioned in the statute takes advantage of the terms of the statute, it becomes a public utility subject to the State's control. *Pulaski Heights Land Co.* v. *Loughborough,* 95 Ark. 264. The statute does not declare such corporations to be public utilities merely because they operate the business mentioned, but. they can not exercise the powers conferred under that statute without being public utilities. If a business so conducted is entirely private, .it is not within the power of the Legislature to confer upon it the power of eminent domain, as that is a power which can be exercised solely for the benefit of the public. Wyman on Public Service Corporations, § 71; *Ozark Coal Co.* v. *Pa. Anthracite Rd. Co.,* 97 Ark. 495. This was the effect given to the California statute by the Supreme Court of that State in the decision just referred to. That court upheld the decision of the Railroad Commission of the State in assuming jurisdiction of a corporation operating a pipe line because of the fact that the corporation had "availed itself of the right of eminent domain in condemning property for the right-of-way over which it constructed its pipe line." The court said: "To our minds this must be deemed conclusive evidence of a dedication of such property to public use, since it could not have exercised such right other than in 'behalf of a public use.'"

According to the evidence adduced before the commission in the present case, appellant had not exercised the right of eminent domain under this statute for the purpose of obtaining a right-of-way for its pipe line, but

the evidence is entirely convincing that it was making preparations to do so, and these contracts on their face, and especially in the light of the testimony adduced with respect to the attitude of the parties at that time, necessarily contemplated the exercise of the right of eminent domain by appellant in equipping itself for the performance of the contracts. The gas field was about twenty miles from the place where the gas was to be delivered to the parties under these contracts. The only available means of transportation was, of course, by pipe lines running from the field to the point of delivery, and this pipe line necessarily would cross railroads and public highways and would cross the Arkansas River. Even if it be conceded that it was within the range of possibility to find some other means of transporting the gas from the field to the point of delivery without condemning a way over private property and without the granting of permits to use the public highways, it certainly was not practicable or reasonable. Nor was it reasonable to expect that the parties had in contemplation some such extraordinary means of transportation. The only reasonable conclusion is that the parties, when they contracted for delivery, meant that it was to be done by a pipe-line which was to be constructed in the exercise of the right of eminent domain over private property in case private grants could not be obtained, and over and along the public highways of the county. It is, therefore, certain that these contracts, though executed before appellant began operating as a public utility, were made in contemplation of such operations by appellant, and were intended as preferential contracts extended to the appellees in priority of any rights of the public.

Shortly after the execution of the first contract, and even before the other contracts were entered into, appellant pursued its preparations for the construction of a pipe line by the exercise of eminent domain under the statute and did in fact acquire a right-of-way under this power. And another significant fact is that it constructed a pipe-line for service under these contracts which was

of a size deemed necessary in order to serve the public as well and to furnish equipment for the transportation of all the gas from the field.   The second contract specified the size of the pipe-line, and, while the first contract contained no such specification, the proof shows that it was known at that time and understood that the pipe-line was to be of a size sufficient to serve all who might wish to obtain gas at the points of delivery along the pipe-line.

There are other facts in this case which indisputably stamp these contracts as being made in contemplation of the entrance of appellant upon the operation of a business which was public in its character and was intended as a preferential right against the public.   In the first place, it is a matter of general knowledge that natural gas is a commodity which is generally developed for the purpose of distribution to the public.   It is not usually handled commercially as the subject-matter of private contracts.   Appellees, in contracting with appellant, were bound to know that the developments were for the purpose of sale of gas publicly to all consumers within the radius of appellant's business operations.   They were bound to take notice of the fact that appellant had obtained a charter authorizing it to carry on business as a public utility.   They knew, as recited in their contracts, that appellant had acquired leases for production of gas in a tremendous area of land and the contracts provided that appellant should acquire more leases and that the contract should cover any other leases thereafter obtained.   In other words, the contracts were made in contemplation of very extensive operations by appellant, probably far in excess of the demands of each of these contracting consumers, and that necessarily meant that appellant would have to seek a market for the remainder of the gas produced, and that the market would be at the points of delivery along its pipe-line, which was to be used as equipment for service under these contracts.   The acquisition by appellant of franchises in several towns and cities, while not shown to be within the actual knowledge of appellees, were matters of such common notoriety

as appellees are presumed to have known of them. When these facts are considered in connection with the potent fact in the case that appellant was preparing at that time to exercise its power under the statute as a public service corporation, the conclusion is irresistible that these contracts were intended as preferential ones, and all rights under them must yield to the superior right of the public to regulate such corporations, and the contracts constituted, in effect, an invasion of the public right, though not such in express terms. *Pipe Line Cases,* 234 U. S. 548. It has been decided by this court that the State had the power, even under statutes enacted subsequent to the execution of contracts, to impose regulations which have the effect of changing the terms of contracts in regard to rates for public services. *Camden* v. *Arkansas Light & Power Co.,* 145 Ark. 205.

We have not overlooked the decision of the Supreme Court of California in the case of *Allen* v. *Railroad Commission,* 175 Pac. 466, cited and relied on so confidently by learned counsel for appellees. We do not, however, think that that case is at all controlling in the present case. There was no indication in that case of the intention on the part of the court to impair the effect of the previous decision in the case we have cited. In that case there were private contracts intended as merely conferring private water rights to numerous parties, and the only circumstance which tended to establish the corporation under consideration as a public utility was the fact that it had been furnishing water to a small town or village which consumed less than three per cent. of the volume of water handled by the company. The court held that under the facts of that case there was no dedication of the bulk of the water handled to the public use. There was no element in that case, as was in the previous decision of that court cited, and in the present case, of the corporation having accepted the terms of a statute which necessarily made it a public service one.

Our conclusion is that the circuit court erred in dismissing the petition of appellant. It is contended by

counsel for appellees that, irrespective of the law of the case as herein declared, the circuit court is presumed to have found from the evidence a state of facts, with respect to the reasonableness of the rates sought to be established by appellant in the schedule filed with the commission, which sustains the judgment, and that we ought to affirm the judgment unless we find it to be unsupported by the evidence. The fact, however, that the court dismissed the petition of appellant, instead of modifying the rates fixed by the commission, is convincing that the court did not base its judgment on any finding as to the reasonableness or unreasonableness of the rates, but on the conclusion erroneously reached that the contracts between the parties were beyond the control of the commission. It is undisputed that the contract rate is now non-remunerative and unreasonable, but the parties are entitled to a finding by the trial court on the issue as to the reasonableness of the rate fixed by the commission—that is to say, a finding based on the evidence adduced before the commission. The judgment is therefore reversed, and the cause remanded for further proceedings.

HUMPHREYS, J. (concurring). I concur in the conclusion reached by the majority that appellant corporation was a public utility at the time it entered into the contracts between it and appellees, but upon entirely different grounds.

I think it extremely doubtful, in the state of the evidence reflected by this record, if the power existed in appellant corporation to elect as between its private and public status, that such election had been made at the time the contracts were entered into. At that time franchises had not been granted to appellant to furnish gas to the general public in the nearby cities of Van Buren and Fort Smith. Appellant did not possess a pipe line and had not attempted to exercise the right of eminent domain to acquire a right-of-way for one. The contracts on their face contain preferential clauses which point unerringly to the fact that it was in the minds of the par-

ties that appellant corporation was at the time a private corporation. Such clauses as these in a contract with a public utility would have rendered the contract void. I can hardly conceive that parties of such intelligence as these entered into a contract carrying clauses which necessarily rendered the contract, from its very inception, void. The parties were certainly attempting to enter into a valid contract and could have done so only upon the theory that appellant was a private corporation, and not a public utility.

The character of business conducted by appellant was subject to regulation by the State, and, being subject to such regulation, the State might at any time convert such a corporation into a public utility by conferring upon it the power to exercise the right of eminent domain. Such right could not be conferred upon a private corporation any more than upon a private person; so the very act of conferring the right of eminent domain upon a private corporation, organized for the purpose of developing and marketing natural gas in the State, converts it *eo instanti* into a public corporation. The power to exercise the right of eminent domain, and not the exercise thereof, is the mark which stamps its character upon it. My interpretation therefore of section 3969 of Crawford & Moses' Digest is that all corporations, theretofore or thereafter incorporated for the purpose of developing, producing and marketing natural gas in this State, are public utilities. . Immediately upon the passage of that act, the right to exercise eminent domain vested in such a corporation and did not remain in abeyance until such corporation elected to exercise it. Any corporation organized thereafter for such purpose became invested with such power, and the power did not remain in abeyance until it chose to exercise it. The character of a corporation must be tested by its powers, and not the exercise of them. If a corporation has the power to exercise the right of eminent domain, it is necessarily a public corporation. So long as it is a private

corporation, it can not possess such power. Interpreting the statute as I do, appellant was a public utility by virtue of the law at the time it entered into the contracts, as it appears from the undisputed evidence that it was organized for the purpose of producing and marketing natural gas in this State.

By request, I note Mr. Justice Wood in agreement with this concurring opinion.