# MARKET ST. RY. CO. v. PACIFIC GAS & ELECTRIC CO. et al.

(District Court, N. D. California, S. D. May 28, 1925.)

No. 1422.

**1. Electricity ⬦11—Contract giving preferential right to be supplied with electricity held to create no property right by way of easement.**

Contract of power company merely giving street railway company preferential right to be supplied with electric current, created no property right by way of easement in power company's lands.

**2. Electricity ⬦11—Contract to supply electricity to be generated not sale in præsenti.**

Contract to supply electric energy to be generated in the future is not a sale thereof in præsenti, under Civ. Code Cal. § 1722, requiring subject of sale to be property, title to which can be immediately transferred, though this does not abrogate the doctrine of potential possession, but is an agreement for sale, within section 1730, and creates no interest in property.

**3. Electricity ⬦11—State can regulate contracts of public utilities with consumers.**

The state can, under police power, regulate contracts of its public utilities with consumers.

**4. Electricity ⬦11 — Enough to authorize change of contract rates that they are not just, fair, or reasonable.**

Point that electric power company's contract rate must be shown to be per se harmful to the public interest before it can be changed is made untenable by commission's finding, on sufficient evidence, that the contract rates are not just, fair, or reasonable.

**5. Electricity ⬦11—Commission's change of rate to afford adequate return is in public interest.**

Change by commission of electric company's contract rates, to afford adequate return on the value of its property devoted to the public service, is in the public interest, and so authorized.

**6. Electricity ⬦11 — Rate contract, made when parties contemplated public service, subject to change by commission.**

In view of power company's charter, authorizing it to carry on business as public utility, and its exercise of power of eminent domain, and recitals in its preferential contract with street railway company to furnish electricity, *held* that, when the contract was made, the parties contemplated a dedication by the power company of its property to public use, so that rates in the contract were subject to regulation.

**7. Electricity ⬦11—Change of contract rate by commission held not to affect preferential right to power given by contract.**

Change by commission of rate provided by contract of power company for furnishing electricity to street railway *held* not to impair provision giving railway company preferential right to power.

**8. Constitutional law ⬦298(1)—Public service commissions ⬦2—Public Utilities Act not unconstitutional, as denying judicial review of commission.**

Public Utilities Act Cal. § 67, is not unconstitutional, as denying due process by way of judicial review of commission's orders; finality of its conclusions on the facts not extending to the facts necessary to its jurisdiction.

In Equity. Suit by the Market Street Railway Company against the Pacific Gas & Electric Company and others for injunction. Preliminary injunction denied.

William M. Abbott, K. W. Cannon, and Edward F. Treadwell, all of San Francisco, Cal., for plaintiff.

Leo H. Susman, J. M. Mannon, Jr., and Allan P. Matthew, all of San Francisco, Cal., for defendant Pacific Gas & Electric Co.

Carl I. Wheat and Woodward M. Taylor, both of San Francisco, Cal., for defendant Railroad Commission.

Before GILBERT, Circuit Judge, and KERRIGAN and BOURQUIN, District Judges.

KERRIGAN, District Judge. This is a bill for an injunction, brought by the Market Street Railway Company, a corporation, against the Pacific Gas & Electric Company, a corporation, the Railroad Commission of the State of California, and its several members, constituting such commission, to restrain said defendants from interfering with plaintiff's rights under a certain written contract.

In the year 1909, plaintiff's predecessor in interest, United Railroads of San Francisco, a corporation, was the owner of and engaged in the operation of a street railway system in that city. For the purpose of acquiring a constant, permanent, and reliable source of supply of electric energy, said United Railroads at that time entered into an arrangement for the formation of a corporation to be known as the Sierra & San Francisco Power Company, and for that company to furnish it with electricity. Previously the Stanislaus Electric Power Company had become owner of certain properties, designed for the generation of electric power, and situated on the middle fork of the Stanislaus river. All of said properties were subject to a mortgage, and at the time mentioned their owner was in financial difficulties, with its power plant not yet completed. For the purposes above mentioned the creation of the power company was arranged, together with the acquisition by it of all the property of the Stanislaus Electric Power Company

on foreclosure sale. Pursuant thereto its incorporation was accomplished, and, receiving from United Railroads and its backers sufficient financial assistance to enable it to obtain money for the completion of its plant, it became the absolute owner of said property.

Thereupon, in consideration of these premises, said United Railroads, said power company, and the Knickerbocker Trust Company of New York, mortgagee of the property, on August 31, 1909, entered into that certain contract in writing, interference with which is here complained of. By its terms United Railroads turned over to the power company transmission lines and conduits owned by the former, and furnished to it certain other facilities for the carrying out of the contract, besides being put to some expense incident to adapting its plant for the reception of the power in the form in which it was to be received under said contract. The parties agreed upon an average net rate of 7½ mills per kilowatt hour to be paid for the power supplied over a term of 44 years, commencing March 1, 1909, and the contract provided for a minimum annual quantity, which might in certain contingencies be increased. The power company was authorized to use or to sell to others surplus power not required by the purchaser, subject to a first and preferential right of the latter to a supply adequate to its requirements. It was expressly provided that the contract should be binding as well upon the successors and assigns of the respective parties as upon the parties themselves.

The power company's articles of incorporation conferred upon it complete powers to function as a public utility in the distribution of electric power. Its water rights, including those to which it succeeded, were acquired under notices of appropriation which specified that the hydroelectric energy to be generated by their use was to be distributed for public purposes. Its tower lines, extending from points in Tuolumne county, Cal., to San Francisco and other central California points, were constructed upon rights of way secured through eminent domain proceedings, one of the suits in which was commenced on the day on which the contract was signed. For upwards of nine years this contract was duly performed by its several parties.

In August, 1918, on account of abnormal increases in operating expenses, the power company applied to the Railroad Commission of California for authority to increase its electric rates, but specifically exempted its principal consumer, United Railroads, from such application, alleging that the contract rate would be commensurate with its increased costs of operation. The Railroad Commission, however, instituted on its own motion a new proceeding, in which it placed United Railroads in the same category as all other of the applicant's consumers.

On October 22, 1918, increases were ordered on all rates, including those established by special contracts. At the hearing United Railroads expressed its willingness to support the power company under abnormal conditions, reserving, however, all of its contract rights. Subject to a stipulation that, in case it should sue for and recover any amount paid in excess of the rate provided by the contract, interest would be paid, United Railroads for a time acquiesced in the increased rate.

On January 1, 1920, the power company leased for a long term of years to the Pacific Gas & Electric Company, a corporation, defendant herein, all of its property and rights, including those under the contract. Ever since said time said lessee has been in possession of the properties, and has supplied United Railroads (or its successor, plaintiff herein) with electric energy and power in accordance with the terms of the contract.

On June 30, 1920, the Railroad Commission added a surcharge of 15 per cent. to the contract rate in an order based on the application of the Pacific Gas & Electric Company (hereinafter called the electric company) to increase all its rates. On April 19, 1921, a 10 per cent. surcharge was added, which, on May 27, 1921, was changed to 6 per cent., the change to operate retroactively. By orders dated December 30, 1922, and March 25, 1924, the rate was fixed at 8½ mills per kilowatt hour, and in some particulars was reduced below that figure.

Plaintiff had notice of all hearings before the Railroad Commission and appeared at all of them, and at each it objected to the making of the orders, as well as maintained their inapplicability to its contract. Since January 1, 1920, when the power company leased to the electric company, plaintiff has paid only the contract rate, and has denied its liability to pay anything in excess of it.

On June 27, 1922, the electric company commenced suit against plaintiff in the superior court of the state of California, in and for the county of San Francisco. In January, 1925, judgment was ordered in favor of the electric company for $420,925.44, a sum representing the differential between the rate

named in the contract and that fixed by the Railroad Commission; the judge before whom the case was tried filing a written opinion. Immediately thereafter, and before findings had been signed or judgment entered, plaintiff filed its bill in this court, and obtained an order temporarily restraining further prosecution of the state court suit.

Plaintiff relies on article 1, § 10, of the Constitution of the United States (the "contract" clause), and on section 1 (the "due process" clause) of the Fourteenth Amendment, claiming also that the California Public Utilities Act (St. 1915, p. 161), and in particular section 67 thereof, is repugnant to and violates other provisions of the federal Constitution. It is averred that irreparable injury will result to plaintiff if defendant is not enjoined from enforcing its state court judgment, and that, unless by this court forbidden, defendant electric company will subject plaintiff to a multiplicity of suits to enforce orders of the Railroad Commission which have no application to it.

More particularly, complaint is made (1) that a contract such as the one here involved cannot be affected by the establishment by the Railroad Commission of general rates; (2) that the orders hereinbefore referred to are invalid, because not made for the public benefit, but merely for the purpose of increasing the dividends of the electric company; (3) that the Public Utilities Act is unconstitutional, because it fails to provide for a judicial review of the facts in evidence before the Railroad Commission unaffected by its action based on them; and (4) that these orders are void, because the property of the power company had not been dedicated to public use prior to the execution of plaintiff's contract, and hence never was subject to public regulation so far as that contract was concerned.

[1, 2] Before proceeding to these major issues, it is necessary to consider plaintiff's introductory contentions: (1) That the contract of August 31, 1909, created a property right by way of easement in the lands of the power company; and (2) that it effected a present sale of electrical energy, of which that company then had potential possession.

As to the first, the contract discloses no intention to create any property rights, and does not purport to impose a specific burden upon the land or water rights of the power company, although it does provide for preferential rights in favor of United Railroads to be supplied with electric current.

With regard to the second preliminary contention, section 1722 of the California Civil Code requires that the subject of a sale be property, title to which can be immediately transferred from the seller to the buyer. This provision has not been construed to abrogate the common-law doctrine of potential possession. It seems obvious, however, that electrical energy which is to be generated in the future has not a potential existence in the normal sense of the term, and hence cannot be termed property. Furthermore, the highest (as well as the latest) authority upon the law of sales of personal property states that the doctrine has been strictly limited to sales of crops to be produced in the future, and to the sales of the future off-spring of animals, remarking that it may be assumed that it will not be extended beyond these cases. 1 Williston, Sales, (2d Ed.) § 133. Plaintiff has cited us to no case holding the contrary. Hence it must be held that the contract of 1909 was not a sale of electricity in præsenti, but what in Civil Code, § 1730, is called an agreement for sale, and that it created no interest either in real or personal property.

[3] On the question of the power of the state to regulate the contracts of its public utilities with their consumers the law is now well settled. "The courts hold that all contracts' relating to public service, entered into between the corporation operating a public utility and the private consumer, contain from the very nature of their subject-matter an implied reservation of the right of the state to lawfully exercise its police power for the general welfare, and that there is no impairment of the obligations of contract within the guaranties of the state or federal Constitution, even though said contract is thereby rendered partially or wholly invalid." In re Guilford Water Company's Service Rates, 118 Me. 367, 108 A. 446, 450; Union Dry Goods Co. v. Georgia Public Service Corporation, 248 U. S. 372, 376, 39 S. Ct. 117, 63 L. Ed. 309, 9 A. L. R. 1420; Producers' Transportation Co. v. Railroad Commission of the State of California, 251 U. S. 228, 232, 40 S. Ct. 131, 64 L. Ed. 239; Arkansas Natural Gas Co. v. Arkansas Railroad Commission, 261 U. S. 379, 382, 43 S. Ct. 387, 67 L. Ed. 705; Ogden Portland Cement Co. v. Public Utilities Commission of Utah, 258 U. S. 609, 42 S. Ct. 381, 66 L. Ed. 788.

[4] Passing the points raised by defendants that the plaintiff was guilty of laches, and that the provisions of section 265 of the federal Judicial Code (Comp. St. § 1242) are applicable to this case, both of which points, we think, have merit, and taking up

plaintiff's other points, it urges, if we understand its first contention, that, admitting the contract to have been subject to regulation, the rate fixed by it could lawfully be modified only after an express finding, based upon evidence, that it in and of itself was unreasonable. In other words, it is maintained that the contract rate must be shown to be per se harmful to the public interest before it can be changed.

It is well established that in a question of rate making there is a strong presumption in favor of the conclusions reached by an experienced administrative body after a full hearing. Darnell v. Edwards, 244 U. S. 564, 569, 37 S. Ct. 701, 61 L. Ed. 1317; Union Dry Goods Co. v. Georgia Public Service Corporation, supra. But in any event the point made is untenable, for the reason that in its order of October 22, 1918, the commission on sufficient evidence has found expressly that "the rates and charges for electricity fixed by the schedules of rates and contracts of the Sierra & San Francisco Power Company * * * are not just, fair, or reasonable rates." 16 Cal. R. C. Dec. 160, 170. In each of the succeeding orders there is an express finding that the rate changed by such order is an unreasonable one. 18 Cal. R. C. Dec. 481; 19 Id. 939; 22 Id. 789; 24 Id. 640.

[5] Plaintiff next argues that all of said orders made since 1918 were made for the sole purpose of increasing the dividends of the electric company, and hence are invalid. What a public utility company is entitled to ask for the service it renders is a fair return upon the actual value of the property devoted by it to the public service, over and above proper operating costs and depreciation and taxes. On this question the cases are unanimous. Smyth v. Ames, 169 U. S. 466, 547, 18 S. Ct. 418, 42 L. Ed. 819; Mississippi Railroad Commission v. Mobile & Ohio Railroad Co., 244 U. S. 388, 391, 37 S. Ct. 602, 61 L. Ed. 1216; Willcox v. Consolidated Gas Co., 212 U. S. 19, 41, 29 S. Ct. 192, 53 L. Ed. 382, 15 Ann. Cas. 1034, 48 L. R. A. (N. S.) 1134; Salt Lake City v. Utah Light & Traction Co., 52 Utah, 210, 173 P. 556, 561, 3 A. L. R. 715; Utah Copper Co. v. Commission, 59 Utah, 191, 203 P. 627, 631; Corporation Commission v. Cannon Manufacturing Co., 185 N. C. 17, 116 S. E. 178, 182; State ex rel. City of Harrisonville v. Public Service Commission of Missouri, 291 Mo. 432, 236 S. W. 852, 858; Darnell v. Edwards, 244 U. S. 564, 568, 37 S. Ct. 701, 61 L. Ed. 1317; Mill Creek Coal & Coke Co. v. Public Service Commission, 84 W. Va. 662, 100 S.

E. 557, 563, 7 A. L. R. 108. And that what is a reasonable return is primarily within the province of the Railroad Commission is almost too well settled to require citation of authority. A., T. & S. F. Railway Co. v. United States, 232 U. S. 199, 221, 34 S. Ct. 291, 58 L. Ed. 568.

In a case already cited (In re Guilford Water Company's Service Rates, 118 Me. 367, 374, 108 A 446, 450) the Maine court says: "The basic principles of the law of public utilities therefore require that the rates should provide the utility an equitable reward on its investment devoted to a public use." And it is no impediment to the power of a public rate-regulating body that a rate sought to be changed has been established by contract between the utility and a consumer, if by the exercise of such power the former is relieved of a burden which changed conditions have rendered onerous and threatens to result in the utility's impaired efficiency in its service to the public. The maintenance of a proper return upon the value of the property devoted to the public service is in the interest of the public, since such service is ultimately dependent upon the continued ability of the utility to attract the money of investors, in doing which it must meet prevailing conditions in respect to investment returns. When, therefore, the public regulating body authorizes a change of rates with a view to affording an adequate return upon the value of the property devoted to the service, its action is in the public interest.

In the case of Salt Lake City v. Utah Light & Power Co., supra, the question of the authority of the Public Utilities Commission of the state of Utah to change a rate theretofore established by a franchise was considered. The facts were that the city granted the traction company a franchise authorizing the construction of a street railway, specifying the maximum rates to be charged. After operating under this franchise for some time, the company applied to the Public Utilities Commission for an increase in rates. The commission made its order by which the franchise rates were increased. It was contended by the city that, inasmuch as the franchise ordinance constituted a contract, the utilities commission was without authority over it. In answering this the court said (52 Utah, 223, 173 P. at page 561):

"It is now settled law that, so long as the state does not interfere, the rates agreed upon between the cities and the street railway companies in the franchise ordinances are

binding and enforceable. Neither party, without the consent of the other, may disregard any rate that is agreed upon between them. Either party may, however, make application to the utilities commission, if one is created by legislative enactment, for the purpose of being relieved from the rates fixed in the franchise ordinance, and if it be made to appear that the rates under existing conditions have become unfair or unreasonable, in that they are either too high or too low, the commission may establish a rate which will again respond to the existing conditions, and may so adjust it as to make it fair, just, and reasonable both to the railway company and to the public. In doing that the constitutional rights of the parties are neither invaded nor disregarded, for the simple reason that, when the original rate was fixed by agreement, it was still subject to modification at any time by the sovereign power of the state, providing the fare as fixed is found to be unfair and unreasonable. Every contract-fixing rate entered into between the cities of this state and street railway companies, both under the Constitution and the statute, is always subject to change by the paramount power of the state, and the right of the state to so change the rates continues, unless and until the Legislature has in express terms surrendered the power or delegated it to some other arm of the state."

It was also held in that case that it is not a prerequisite to the exercise of the power to increase an existing contract rate that the earnings of the utility should be insufficient to meet the expenses of operation, but that a proper return upon the value of the property devoted to the public service must also be considered.

[6] It is next urged by the plaintiff that, when the contract was made in 1909, the power company had not yet become a public utility, and nothing that the latter did thereafter could make its prior existing contract subject to regulation. Defendant has cited cases, which we regard as highly persuasive, to the effect that all the contracts of a public utility, whenever made, must yield to the public interest. Under these authorities the sole question is whether, at the time regulation is attempted, the company affected has undertaken public service, and the date of its contract is immaterial. Yeatman v. Towers, 126 Md. 513, 95 A. 158, 160; Producers' Transportation Co. v. Railroad Commission of the State of California, 251 U. S. 228, 231, 40 S. Ct. 131, 64 L. Ed. 239; Manigault v. Springs, 199 U. S. 473, 480, 26 S. Ct. 127, 50 L. Ed. 274.

Assuming, for the sake of argument, that the orders of the Railroad Commission would have been void, had the property of the power company not been dedicated to public use before the date of the contract, in 1909, there is an abundance of evidence in the record that such dedication had at that time been made. This cannot be summarized better than in the language of Judge Johnson's opinion in the state court: "The water appropriations to which the power company succeeded were made undeniably with a view to public sale of hydroelectric energy; the articles of incorporation of the power company were framed so as to permit service to the public; powers of eminent domain were exercised by the power company and its predecessors professedly in the public interest; and by its general course of conduct the power company held itself out as a purveyor of a product devoted to public use."

The fact that the power of eminent domain was exercised might of itself be held to be conclusive evidence that the power company, before making the contract, had devoted its property to service of the public. Producers' Transportation Co. v. Railroad Commission of the State of California, supra.

The circumstances enumerated by Judge Johnson are conclusive that on August 31, 1909, the power company had undertaken public service; and, taken together with the recitals of the contract itself, they indicate beyond all reasonable doubt that such service, as was well known to United Railroads, was contemplated by the power company, with the consequence that the latter company and all its contracts would become subject to public regulation. Ft. Smith Spelter Co. v. Clear Creek Oil & Gas Co. et al., 267 U. S. 231, 45 S. Ct. 263, 69 L. Ed. ——; Id., 148 Ark. 260, 230 S. W. 897, 901, 902.

The case just cited, decided as lately as March 2, 1925, is, we think, conclusive of the propriety of the orders under consideration. Its facts in many respects are identical with those of the case at bar. There the Clear Creek Company entered into contracts with the Spelter Company and others for the sale of natural gas. Its producing fields were situated at a distance of 20 miles from the consumers (a tenth of the distance in the present case), and construction of a pipe line was essential. To this, one consumer contributed $45,000 in cash. All the contracts were "preferential" in their nature and extended over periods of years. After ex-

ecuting the first of these and before executing the others the Clear Creek Company exercised the power of eminent domain in obtaining rights of way. A pipe line was built but of a size deemed necessary in order to serve the public as well as preferred customers. The former became in fact a substantial consumer. The preferential contracts proving in course of time unremunerative, application was made to the Arkansas commission for leave to increase the rates. In the course of its opinion, affirming the validity of the increases which were made, the Arkansas Supreme Court said:

"Even if it be conceded that it was within the range of possibility to find some other means of transporting the gas * * *, without condemning a way over private property, and without the granting of permits to use the public highway, it certainly was not practicable or reasonable. Nor was it reasonable to expect that the parties had in contemplation some such extraordinary means of transportation. * * * It is a matter of general knowledge that natural gas is a commodity which is generally developed for the purpose of distribution to the public. * * * Appellees, in contracting with appellant, were bound to know that the developments were for the purpose of sale of gas publicly within the radius of appellant's business operations. They were bound to take notice of the fact that appellant had obtained a charter authorizing it to carry on business as a public utility. * * * When these facts are considered in connection with the potent fact in the case that appellant was preparing at that time to exercise its power under the statute as a public service corporation, the conclusion is irresistible that these contracts were intended as preferential ones, and all rights under them must yield to the superior right of the public to regulate such corporations. * * * "

That the power company in the case at bar contemplated public service is also apparent from the contract itself, which in its third section provides: "Power company at all times shall be free to use or to sell to others than Railroads Company any portion of the energy and/or power which can be produced, * * * subject to Railroads Company's first and preferential right. * * * " Its fourteenth section provides that United Railroads shall be a "preferred customer," and its second that, in addition to energy which that company may demand upon 12 months' written notice, the power company is obliged to "furnish such additional power on less than 12 months' written notice, if desired by Railroads Company, to the extent that it has power unsold at the time of delivery of notice."

As proof that such public service was in fact undertaken, it is to be noted that within less than 9 years its activities were so enlarged that in 1917 it supplied electricity for heat, light, and power purposes over an extensive territory to 6,196 consumers, including in their number several large mines, a cement mill, and other electric railways than United Railroads. 16 Cal. R. C. Dec. 161, 162. Accordingly, we hold that when the contract was made its parties contemplated a dedication by the power company of its property to public use.

[7] Plaintiff has been required to submit to an increased rate; but the contract has not been abrogated, and its preferential rights remain unimpaired. Chicago Railways v. City of Chicago, 292 Ill. 190, 201, 202, 126 N. E. 585, 598. As was said by the Circuit Court of Appeals for this circuit, less than two months ago: "A lawful change of a rate fixed by a public service company under a contract for doing a service does not destroy the contract, but modifies its terms consistently with what presumably the parties to the contract incorporated in their agreement." Northern Pacific Railway Co. v. St. Paul & Tacoma Lumber Co. (C. C. A.) 4 F.(2d) 359, 363, citing Union Dry Goods Co. v. Georgia Public Service Corporation, supra, and Suburban Water Co. v. Oakmount, 268 Pa. 243, 110 A. 778. So long as the state did not intervene, both parties were bound by all the contract's terms (Southern Pacific Co. v. Spring Valley Water Co., 173 Cal. 291, 300, 159 P. 865, L. R. A. 1917E, 680); but, because of the nature of its subject-matter, either might, at any time after the intervention of the public interest, have made application to the Railroad Commission to be relieved from a rate which had become either unreasonably high or unreasonably low (Salt Lake City v. Utah Light & Traction Co., supra). Hence plaintiff's rights have not been abridged, for at their inception they were subject to just such an eventuality as actually occurred.

[8] A single question remains: Is the Public Utilities Act of California, and particularly its sixty-seventh section, unconstitutional, because, as contended by plaintiff, "it allows no judicial review of the orders of the Railroad Commission, in that under its terms not even the Supreme Court has any power to exercise an independent judgment as to the facts"?

Regarding plaintiff's right to receive service from the Power Company or its lessee at the agreed price as property, and a decrease in the contract rate as a taking of property, it is contended by plaintiff that this taking is without due process of law, for the reason that the Public Utilities Act gives it no right to have a judicial tribunal review the facts upon which the rate-making body acted.

If, as we have held, this contract was subject to the subsequent action of the rate-making body, the proper exercise of the authority of that body is a contingency within the contemplation of the parties in entering into the contract; and it might fairly be argued that, if such exercise should result in the establishment of a higher rate than that originally stipulated between the parties, this could not be correctly characterized as a taking of property, unless the new rate be higher than is necessary to afford a proper return upon the value of the property devoted by the utility to the service of the public. This the bill does not charge, but is framed on the theory that the contract of August 31, 1909, is not subject to the exercise of the police power of the state with regard to its rates, and that such rates are inviolate. This position is untenable, as shown by the authorities already cited. Plaintiff, therefore, to make good its present contention, must establish that it has been denied a judicial review upon the question of the existence of facts essential to the exercise of the jurisdiction of the Railroad Commission, through whose action it claims to have been deprived of its property.

This, the plaintiff claims, Public Utilities Act, § 67, in fact does. That section, however, has been broadly interpreted by the California Supreme Court, so as to afford a review upon the question of these essential facts. In Traber v. Railroad Commission of the State of California, 183 Cal. 304, 307, 191 P. 366, 368, it is said: "Notwithstanding the declaration of section 67 that the commission's determination of matters of fact is not subject to review, it must be held that its determination upon the question whether or not the facts existing are sufficient to bring the case within the scope of its powers must be subject to review, so far as they present a question of law bearing upon that subject, and that the provision that the 'conclusions' of the commission on the facts are final does not apply to facts necessary to the existence of the jurisdiction of the commission to act. Del Mar, etc., Co. v. Eshleman, 167 Cal. 677, 140 P. 591, 948. But if the evidence in proof of such facts is substantial in character and justifies the inference or conclusion that the facts necessary to the jurisdiction of the commission did exist, then, under the general principles of law regarding the proceeding in certiorari, its decision as to the effect of such evidence is binding and conclusive on the reviewing court." In accordance with this interpretation of section 67 of the act, that court reviewed the evidence in the cases of Richardson v. Railroad Commission of the State of California, 191 Cal. 716, 218 P. 418, Klatt v. Railroad Commission of the State of California, 192 Cal. 689, 221 P. 926, and McCullagh v. Railroad Commission of the State of California, 190 Cal. 13, 210 P. 264.

From what has been said it follows: (1) That the service contract entered into on August 31, 1909, between United Railroads and the power company was on October 22, 1918, and at all times since has been, subject to regulation by the Railroad Commission of the state of California; (2) that the Public Utilities Act, under and by authority of which said commission regulated said contract, is not violative of the provisions of the federal Constitution; and (3) that the orders herein complained of are valid, proper and in all respects legal. Plaintiff's motion for a preliminary injunction is therefore denied.

GILBERT, Circuit Judge, concurred.

BOURQUIN, District Judge (concurring). I concur in the result. However, as in court review of the commission's orders, it is as vital to due process of law that upon the evidence independent judgment be exercised in respect to the commission's jurisdiction as to its rates, and as the state Supreme Court construes the state statute to withhold from the state courts power to exercise this independent judgment in both instances (Traber v. Railroad Commission of the State of California, 183 Cal. 307, 191 P. 366), it is clear that so far as review in the state courts is concerned there is no due process. See Ohio, etc., Co. v. Ben Avon Borough, 253 U. S. 289, 40 S. Ct. 527, 64 L. Ed. 908.

But plaintiff, instead of proceeding in the state courts, comes into this federal court, the plenary equity powers of which are unaffected by the restrictions of the state statute. Reagan v. Farmers L. & T. Co., 154 U. S. 395, 14 S. Ct. 1047, 38 L. Ed. 1014. Herein it can have exercise of our independent judgment upon all issues it presents, including that of the commission's jurisdiction over the property involved. In other words, herein plaintiff has due process of law. This

course seems to be sanctioned by Bluefield, etc., Co. v. Com., 262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176, and Oklahoma, etc., Co. v. Love, 252 U. S. 331, 40 S. Ct. 338, 64 L. Ed. 596, despite the radical difference in review between them and the Ohio-Ben Avon Case, supra.

Accordingly, consideration of the evidence as it now appears indicates probability that at final hearing plaintiff's case will fail, that the property will be found devoted to public service and within the commission's jurisdiction, and the latter's order valid. That suffices to require denial of injunction pendente lite. The law of rates is by no means settled and clear, as appears from the Supreme Court cases, supra, and their citations. Nevertheless it seems that the earlier rule that state statutes denying judicial review are unconstitutional has been abandoned in favor of the rule that in any case the federal courts will try and determine the merits of the issue, and adjudge the commission's order valid or invalid accordingly, which is but to say that the statutes are constitutional, though in their application, as in that of any statute, orders pursuant to them may not be.