THE STATE ex rel. CITY OF HARRISONVILLE v. PUBLIC SERVICE COMMISSION OF MISSOURI et al.; GREEN LIGHT & POWER COMPANY, Appellant.

THE STATE ex rel. CITY OF HARRISONVILLE v. PUBLIC SERVICE COMMISSION OF MISSOURI et al., Appellants.

In Banc, January 21, 1922.

1. **PUBLIC SERVICE COMMISSION: Light Rates: Abrogation of Contract With City.** Contract prices for electricity to be furnished by an electric company to a city under a lease, submitted to and ratified by its citizens, whereby the company took over an existing plant belonging to the city, are subject to the police power of the State, and the Public Service Commission has power to establish reasonable rates, both for the city and its inhabitants, different from and either above or below those prescribed by the contract.

*Held,* by HIGBEE, J., dissenting, that, the contract, containing a schedule of rates to be charged during the term of the lease, and being submitted to and ratified by the citizens, is safeguarded both by the Federal and State Constitution, and no

emergency exists justifying the Commission in abrogating the contract, there being no question present of the State confiscating the company's properties. The State cannot, under its police power, increase the rates fixed by the contract in order that the company may have a reasonable income from its investments and pay dividends to its stockholders. The company can relieve itself against its contract only when it is clearly shown that the public welfare demands it.

2. ———: Reasonable Rates: Commission's Prima-facie Lawful: Burden of Proof. The statute (Sec. 10534, R. S. 1919) expressly provides that all rates of a public utility fixed by the Public Service Commission shall be prima-facie lawful, and are therefore presumed to be reasonable. The statute (Sec. 10535, R. S. 1919) also places the burden of proving by clear and satisfactory evidence, that the rates fixed by the Commission are unreasonable and unlawful, upon the party seeking to annul and set the same aside.

*Held*, by HIGBEE, J., dissenting, that, the company having entered into a contract with the city and its citizens to furnish electricity at schedule rates, the burden is on it to prove that an emergency exists justifying an increase in the rates.

3. ———: ———: Inadequate Earnings: Increase: Public Welfare. A net profit of four per cent on the fair value of an electric light plant can scarcely be held to be an adequate return, in view of increasing prices of coal and wages; and where the net profit from furnishing electricity to a city in 1919 was only a trifle over four per cent on the fair value of the properties used in such public service, an increase by the Public Service Commission in the rates sufficient to make possible a profit of 6.83 per cent, to be effective for thirteen months, will not be held to be unreasonable.

*Held*, by HIGBEE, J., dissenting, that the rates cannot be increased for the mere purpose of enabling the company to earn a profit on its investment, but having voluntarily entered into a contract to pay the existing rates, and there being no question of a confiscation of its properties present, it can be relieved from the obligations of said contract only upon a showing that an increase is demanded by the public welfare.

4. ———: ———: General Distribution Plant: Apportionment. Where the utilities company owns one central plant, from which transmission lines extend to numerous towns and cities, by which all are supplied with electricity, it cannot be said to be unreasonable to classify them into groups, and fix one rate for those on

291 Mo. Sup.—28

the main lines and a somewhat higher rate for those on the spur lines, thereby causing each customer to pay his just portion of the cost of service, the evidence showing that, owing to loss in transmission, the greater the distance of a town from the producing plant the greater the cost of the current delivered.

5. ———: ———: ———: **Deference to Commission.** The court is not concerned with the expediency or wisdom of the order of the Public Service Commission classifying customers of a distribution electric light plant into groups, and charging different rates to the different classes, according to some reasonable rule of classification. The findings of the Commission being by statute made prima-facie lawful, the court will ascribe to them the strength due to a judgment of a tribunal created by law and informed by experience, where its power has not been exercised arbitrarily, and the rates it has established are not unreasonable, and its order is not violative of the Constitution or wanting in statutory authority and is supported by substantial evidence.

Appeal from Henry Circuit Court.—*Hon. C. A. Calvird,* Judge.

REVERSED.

*R. Perry Spencer,* General Counsel, and *James D. Lindsay,* Assistant Counsel, for Public Service Commission.

(1)   The Green Light & Power Company was, and is, an "electrical corporation" (Sub. div. 13, Sec. 10411, R. S. 1919), and subject to the jurisdiction of the Public Service Commission (Sub. div. 5, Sec. 10425, R. S. 1919), being engaged in the manufacture, sale and distribution of "electricity for light, heat and power," and as "owning, leasing, operating or controlling" an electric plant, for the manufacture, sale and distribution of electricity, and is under the "general supervision" of the Commission (Sec. 10478, R. S. 1919), as "having authority under any special or general law or under any charter or franchise to . . . erect or maintain wires . . . or other fixtures in, over, or under the streets, highways, and public places of any municipality for the purpose . . . of furnishing or transmitting elec-

tricity for light, heat or power,'' and the supervision
extends to the electric "plant owned, leased or operated
by any  .  .  .  electrical corporation.'' (2)  The com-
pany, as an electrical corporation and the city, a munic-
ipal corporation, could make no contract whereby the
company and the city in respect of service and rates—
the obligation to serve the public on the one hand, and
the compensation for that service on the other—could
withdraw the company and the city, or either of them,
from the regulatory power of the State, as to either serv-
ice or rates.  Sedalia v. Public Serv. Comm., 275 Mo.
201; Fulton v. Public Service Comm., 275 Mo. 67; Kan-
sas City Bolt & Nut Co. v. Kansas City L. & P. Co., 275
Mo. 529; Pawhuska v. P. Oil & Gas Co., 250 U. S. 394;
State ex rel. M., K. & T. Ry. Co. v. Commission, 271 Mo.
270, 286.  (3)  Under the contract, the city contracted
in its proprietary capacity for the receipt of seventy-five
dollars per month as rental for its plant, and, in addi-
tion, for free service in lighting its streets and public
places, and these elements of the contract remain un-
disturbed by the order of the Commission, but, the fur-
ther effort of the city, by contract, to fix, not in a pro-
prietary, but in a governmental capacity, rates to be
paid by private consumers, for a period of ten years
is unavailing as against the regulatory power of the
State, and is unmistakeably upon a subject within the
exercise of the police power.  Authorities above; Kan-
sas City v. Comm., 276 Mo. 539.  (4)  The Commission
in determining valuation and the rates to be charged,
took into consideration the original cost of construction,
the amount expended in permanent improvements, the
present as compared with the original cost of construc-
tion, the probable earning capacity of the property un-
der the existing rates, the sum required to meet operat-
ing expenses, and all the other pertinent facts ascertain-
able.  Conclusions so reached should be sustained by
the court.  Smythe v. Ames, 169 U. S. 466; San Diego
Co. v. Jasper, 189 U. S. 439; Stanislaus Co. v. San Joa-
quin Co., 192 U. S. 201; Knoxville v. Knoxville Water

State ex rel. Harrisonville v. Public Serv. Commission.

Co., 212 U. S. 1; Minnesota Rate Cases, 230 U. S. 352; Gas & Electric Co. v. Lincoln, 250 U. S. 256. (5) The conclusions of the Commissions as to the valuation of the property, and as to the actual and relative amounts of income and expenditures for operation, being supported by the evidence, must be sustained. State ex rel. S. W. Bell Tel. Co. v. Public Service Comm., 233 S. W. 425, and concurring opinion of BLAIR, J., p. 436. (6) The provision for an adequate income made by the Commission through the rates authorized was reasonable, and the return received under the former rates was inadequate, and in a measure confiscatory. Lincoln Gas Co. v. Lincoln, 250 U. S. 256, 267. (7) The division of the cities and towns involved into two groups and placing Harrisonville in the group, including also Lee's Summit, Pleasant Hill and Holden, was a practical conception and solution of a practical, and otherwise complex, question, indeterminable without intricate and arbitrary niceties of calculations. Making rates for the fifteen cities, including Harrisonville, served from the same generating plant, presented, within certain general fundamental rules, a purely practical problem, which was solved in a practical way in the instant case. Rearick v. Pennsylvania, 203 U. S. 507, 512; Pipe Line Cases, 234 U. S. 548, 560; Public Utilities Comm. v. Landon, 249 U. S. 245.

*De Armond & Maxey* and *Busby, Sparrow & Patterson* for appellant, Green Light & Power Company.

(1) The power of the Public Service Commission to prescribe reasonable rates cannot be abrogated or stayed by municipal ordinances or franchise contracts. State ex rel. Sedalia v. Public Service Comm., 275 Mo. 201, 204 S. W. 497; 40 Sup. Ct. 342; Fulton v. Public Service Comm., 275 Mo. 67, 204 S. W. 386, 40 Sup. Ct. 342; Puget Sound T. L. & P. Co. v. Public Service Comm., 244 U. S. 574; Elec. Ry. v. Ry. Comm., 238 U. S. 174; Worcester v. St. Ry. Co., 196 U. S. 539; New Orleans v. Water Works Co.,

.142 U. S. 79; Home Tel. & Tel. Co. v. Los Angeles, 211 U. S. 265; Portland Ry. L. & P. Co. v. Portland, 210 Fed. 667; Union Dry Goods Co. v. Public Service Corp., 248 U. S. 372; People ex rel. N. Y. & N. S. T. Co. v. Pub. Serv. Comm., 162 N. Y. Supp. 405, P. U. R. 1917 B, 957; People ex rel. Bridge Co. v. Pub. Serv. Comm., 138 N. Y. Supp. 434, 153 App. Div. 129; Chicago v. O'Connell, 278 Ill. 591, P. U. R. 1917 E, 730; Public Utilities Com. v. Quincy, P. U. R. 1920 B, 313.  (2) If the Public Service Commission had permitted the ordinance rates to stand at Harrisonville, then the loss suffered there must have been made up by increased rates from the other towns served—a result which would have clearly been discriminatory and unfair, and which justified the exercise of the police power.  (3)  The Public Service Commission, in considering the entire Green plant as a single unified system, and in establishing uniform non-discriminatory rates for it, followed the only fair, practicable and non-discriminatory method possible.  The law expressly directs the adoption of such method.  Pars. 2 and 3, sec. 10477, R. S. 1919; Brown v. Water Co., 1 Mo. P. S. C. 359; Ben Avon Borough v. Water Co., P. U. R. 1917 C, 420. (4)  The evidence before the Commission conclusively showed that the company was earning a return wholly inadequate and insufficient to permit the continuation of its business as a going concern.  Under such evidence, the law required an order allowing additional revenue. (a)  The evidence establishing the value of the property or rate-base at $409,000 was clear and positive.  No evidence to the contrary was offered;  (b) The evidence of inadequate return in 1919 and proof of still greater loss in 1920 was uncontradicted.

*Allen B. Glenn* and *A. A. Whitsitt* for respondent, City of Harrisonville.

(1)  The spirit of the policy involved is protection of the public.' The purpose in this case is to require the lessor, the city of Harrisonville, to contribute its means

438     SUPREME COURT OF MISSOURI,

State ex rel. Harrisonville v. Public Serv. Commission.

to build up an extensive and valuable plant for future use beyond the time of the life of the lease, and the rule cannot be made applicable without discrimination, as between owner and lessor, as to other property acquired, in which the lessee has no interest. (2) The Public Service Commission erred in receiving illegal and incompetent testimony and in giving weight to the audit of T. J. Murphy, Clinton H. Montgomery and Burns & McDonnell appraisement, the same being incorrect. State ex rel. v. Atkinson, 275 Mo. 337; Covington and Lexington Turnpike Co. v. Sanford, 164 U. S. 596; Pond on Public Utilities, sec. 444. (3) The manner of assessment accepted by Public Service Commission of valuing according to sliding scale of four years, which admittedly tended to increase values over purchase price, was unjust and inequitable. State v. Public Serv. Comm., 233 S. W. 425. (4) The acts of the Public Service Commission, when called in question, are required to hear and determine matter involved in such manner as to do full and complete justice in the premises. State v. Public Serv. Comm., 233 S. W. 425; State ex rel. v. Pub. Serv. Comm., 272 Mo. 652. (5) The contract in question, or lease, is such as cannot be interferred with or abrogated by the Public Service Commission. (6) The evidence shows that the city of Harrisonville is paying a reasonable return for all investments and cost of doing business therein. (7) The Public Service Commission arbitrarily and unjustly fixed and made orders and findings against the city of Harrisonville. State v. Pub. Serv. Comm., 233 S. W. 425. (8) The Public Service Commission wrongfully estimated as investment of the Green Light & Power Company the $40,000 for business development and $14,815.70 for engineering cost and $12,438.85 for interest during construction as against Harrisonville, as the business was established when received by said company.

*Peyton A. Parks* of counsel for respondent.

(1) The reasonableness or justice of an order of the Public Service Commission will be determined by the

court upon a review of all the evidence, as in a trial of a suit in equity. State ex rel. v. Pub. Serv. Comm., 272 Mo. 652. (2) The evidence in any case, appealed from the Public Service Commission, is required to be preserved and transferred to the circuit court and that court determines the case on that evidence as in suits in equity. On appeal from circuit court, the Supreme Court determines the propriety of the judgment of the circuit court, as in an equity case, and will direct a reversal or affirmance of the judgment of the trial court. C. B. & Q. R. R. v. Pub. Serv. Comm., 266 Mo. 341, 346; Lusk v. Atkinson, 268 Mo. 117; State ex rel. v. Pub. Serv. Comm., 271 Mo. 161, 165; State ex rel. v. Pub. Serv. Comm., 272 Mo. 652. (3) When acts of Public Service Commission in fixing rates are called in question, the courts are required, as in the review of equitable proceedings, to hear and determine the matter involved in such a manner as to do full and complete justice in the premises. State v. Pub. Serv. Comm., 233 S. W. 425. (4) The question as to what percentage of the value of the property should be allowed as a reasonable return in fixing rates must be made dependent upon the facts and circumstances of the particular case. State ex rel. v. Pub. Serv. Comm., 233 S. W. 425. (5) Where public service corporations, and municipalities dealing with them, have power to contract as to rates, and exert that power by fixing by contract rates to govern for a particular time, the enforcement of such rates is controlled by the contract, and therefore the question of whether such rates are inadequate, or even confiscatory, becomes immaterial. Water Co. v. Freeport, 180 U. S. 587; Detroit v. Detroit City R. R. Co., 184 U. S. 368; Water Co. v. Knoxville, 159 U. S. 434; Cleveland v. City Ry. Co., 194 U. S. 519; Home Tel. Co. v. Los Angeles, 211 U. S. 265; Minneapolis v. St. Ry. Co., 215 U. S. 417; R. P. & L. Co. v. Columbus, 249 U. S. 399.

ELDER, J.—This is an appeal from a judgment rendered by the Circuit Court of Henry County upon a writ

of *certiorari* directed to the Public Service Commission, which judgment reversed and set aside the findings and orders of the Commission in increasing rates for electricity furnished by the Green Light & Power Company, in so far as such findings and orders affected rates for electric service rendered in the city of Harrisonville. From such judgment the Public Service Commission has appealed. The Green Light & Power Company having intervened in the cause, an appeal was likewise taken by it. The two appeals were consolidated and argued as one in this court. We shall accordingly treat of them together. For convenience the city of Harrisonville will be referred to as the "city," the Public Service Commission as the "Commission," and the Green Light & Power Company as the "Company."

The facts involved are substantially as follows:

Prior to August, 1918, the city was the owner of an electric light plant, consisting of equipment for the generation of current and of a distribution system, which plant was operated by the city for the purpose of lighting its streets and furnishing light and power to its citizens. In the fall of 1916 the firm of Green & Sons purchased the electric light plant at the city of Pleasant Hill and, in 1917, began the construction of a new electric power plant at that city, equipped with two 354-horsepower boilers with automatic stokers, two turbogenerators, feed pumps, heaters, piping, transformers and other machinery for producing current. In November, 1917, the company was organized, taking over the property formerly owned by Green & Sons. After the construction of the new power plant at Pleasant Hill, additional transmission lines were built and distribution systems added by the company until fourteen other cities and towns in Jackson, Cass, Johnson, Lafayette and Bates counties were being served. In June, 1918, the company made a proposition to the city to lease its light plant. An ordinance passed by the board of aldermen, setting forth the terms of the proposed lease, was

duly submitted to the people of the city at an election held August 16, 1918, and the same was ratified by a majority vote of the citizens voting. Pursuant to such ordinance a lease was duly entered into between the city and the company, under date of August 26, 1918, by which the city leased to the company, for a period of ten years, the light plant theretofore operated by it.

By the terms of the lease the company took over the plant at an appraised valuation, subsequently fixed at $11,315.28, with the right to remove, use or sell the engines, generators, dynamos, switchboards, boilers and other fittings, accounting to the city at the appraised value thereof. This right the company exercised, leaving and using that part of the plant devoted to distribution of current. The company was required to pay to the city seventy-five dollars per month during the term of the lease, and to maintain and furnish, free of all charges to the city, all street lights, the city, however, to maintain the "White Way" posts and cable. The lease also provided that upon its expiration the property should be again appraised, and, if the ascertained value should be less than the first appraisal, the company should pay the difference to the city, and if found to be greater, the city should pay the company the amount of the excess of value so found. It also contained a schedule of rates to be charged by the company, the maximum for residence use of lights being ten cents per kilowatt-hour, the maximum for business house being ten cents per kilowatt-hour for the first twenty-five kilowatts per month, and a sliding scale for succeeding kilowatts, and the maximum for power being eight cents per kilowatt-hour for the first twenty-five kilowatts per month, and a sliding scale for succeeding kilowatts.

After the plant of the city was leased, the company connected up the distributing system at the city with its central plant at Pleasant Hill and served the city, Pleasant Hill, Lee's Summit and Holden, the principal cities in the territory, through its main transmission lines. The other smaller towns were served through spur or sub-

sidiary transmission lines.    This arrangement constitut-
ed a system operated as an entirety.

On November 21, 1919, the company filed with the
Commission a schedule of rates and charges which it
proposed to put into effect in all the municipalities
served, the proposed rates for consumers at the city
being higher than those specified in the lease to the com-
pany.  A protest being filed by the city, the Commission
suspended the operation of the proposed new rates from
January 1, 1920, to April 29, 1920, pending an investiga-
tion by the Commission as to the reasonableness and law-
fulness of the same.    Pursuant to notice duly given, a
partial hearing was had at the city before Commissioner
Blair, on February 13, 1920, but owing to lack of sufficient
data the hearing was continued to a future date to be
set by the Commission.    Thereafter, on April 27, 1920,
the company asked leave to withdraw the schedules there-
tofore filed, and requested that the Commission establish
rates in each of the towns served, which would produce
an adequate return on the capital invested.    The Com-
mission ordered a further suspension of the new rates
proposed, from April 29, 1920, to October 29, 1920, and
proceeded at a hearing, held July 14, 1920, at the city,
before a special examiner, to take testimony to determine
the rates which should be allowed,    Much of the testi-
mony adduced was irrelevant to the issue presented and
we shall not endeavor to reproduce it.

Mr. L. K. Green, president of the company, testified,
in part, that the investment in the entire plant of the
company, as shown by an audit made by accountants, was
approximately $450,000;  that the population of the var-
ious towns supplied with electricity was approximately
15,500;  that the net return on the investment had been
about 4.3 per cent; that in 1919 he received a salary as
president and general superintendent of $200 per month,
and in 1920 of $300, that in 1919 his two sons, who looked
after the transmission lines, received salaries of $150
per month each, and in 1920 of $200 per month each;
that Mr. Gobiet, secretary of the company, who kept the

books, received $125 per month in 1919, and $200 per month in 1920; that coal which formerly cost $1.95 per ton was at the time of the hearing costing $4.35 per ton; that oil was from twenty-five to fifty per cent higher than formerly; that all electrical supplies used in connection with the operation of the power house were one hundred per cent higher; that the wages of engineers had increased from $60 and $75 per month to $100 and $150; that pole-handlers, formerly hired for $1.75 per day were then being paid $4 a day; that it cost $462.74 per month to do business in the city, exclusive of the cost of producing the current. Asked if it would be possible to determine a fixed and stable portion of the total expense of production of electric current at the Pleasant Hill plant to be charged to the various towns served, the witness answered:

"No. sir, I don't think you could make any division that would remain permanent, for the reason you might have one town that was growing and would put on, say, twenty-five customers in a month, and another town supplied from the same transmission line on the other side might not put on any and might loose a few; so it wouldn't be a fixed quantity for any length of time for any given point for that reason. Things would change because of changing load because of adding or losing customers.

"Q. Is there any change in the varying periods of time that customers use electricity? A. Well, in the winter time they use considerable more current than they use in summer time in some respects. In other respects it might be different. For instance, an ice plant would use more current in the summer time than in the winter, but the average light user would use more in the winter than in the summer. So that is the reason there would not be anything stable in charging against any one town a given quantity, for they do change.

"Q. Have you any objection for a separate rate being fixed as to each separate town? Are you objecting to that? A. No, sir, if the Commission sees fit to make

us a rate that they think is fair on that kind of allotment, we would be willing to take it and do the best we can with it.

"Q.   Have you any objection to a uniform rate for all the service, if the Commission believes that to be the most equitable?   A.   No, sir, we are willing to accept that if the Commission desires."

On cross-examination the witness testified:

"Q.   As a matter of fact, Mr. Green, it is pretty hard at any one period to get at, if not impossible to get at, the exact expenditures for any one place, for the reason that you are all the time increasing your lines and extending your lines and making new improvements?   You are doing that all the time, aren't you?   A.   Pretty generally.

"Q.   And you are doing it now?   You have run since this started down on the Chicago & Alton and giving light how far?   Odessa?   A.   Yes, sir.

"Q.   Giving light clear down to Odessa?   A.   Yes, sir.

"Q.   When you buy these people out along the line and then go ahead and furnish them, regardless of the size of the town, as a matter of fact it costs more to furnish a small town than it does a large one, dosn't it?   A.   Generally speaking, that would probably be true.

"Special Examiner:   You don't mean the larger aggregate, do you?   The larger per capita?   The Witness:   A larger per capita; larger per customer."

An appraisal of the plant and equipment of the company, made by Burns & McDonnell, consulting engineers, was introduced in evidence.   A summary thereof is as follows:

State ex rel. Harrisonville v. Public Serv. Commission.

| Description | Reproduction Cost | Depreciated Cost |
|---|---|---|
| Land | $  3,423.25 | $  3,423.25 |
| Structures | 29,297.70 | 28,418.75 |
| Boiler Plant Equipment | 28,150.80 | 26,743.25 |
| Generating Equipment | 44,795.70 | 42,555.90 |
| Water Supply Equipment | 21,343.30 | 20,916.45 |
| Distribution System | 246,805.40 | 226,065.50 |
| General Equipment | 7,007.45 | 5,605.95 |
| Expenditures during construction | 53,250.50 | 49,629.45 |
| Total Physical Value | $434,074.10 | $403,358.50 |
| Working Capital | 8,000.00 | 8,000.00 |
| Business Development Cost | 40,000.00 | 40,000.00 |
| GRAND TOTAL | $482,074.10 | $451,358.50 |

The Commission found that the item of ''Water Supply Equipment'' contained in the above summary, should be deducted, as such equipment was being used in furnishing water to the city of Pleasant Hill. This left the total physical value reproduction cost at $412,730.80, and the depreciated cost at $382,442.05.

Mr. C. F. Lambert, of the firm of Burns & McDonnell, in explanation of the method by which the valuations fixed in the appraisal were determined, testified as follows:

''We divided it up, the line, into sections to each point where there was a junction point, and then the valuation as we have got it here, cost of transmission poles and fixtures, in one item, and the copper wire and high tension switches in another, transformers, separate, etc., as you would have to add each one of them.

''Q. What was your basis for the division? A. We had no basis for division. We simply made it each section, so if it was desirable it could be added up. That is, we took the line from Pleasant Hill to a junction point and got the material, and from that point to another junction point, regardless of the town. We didn't attempt to make a division and charge any particular part of the line to any point, but simply made the division and made it so if it was desirable you could figure any section you wished.

"Q Then what you charge against Harrisonville is an arbitrary rule you figured out yourself? A. We didn't charge anything against Harrisonville.

Q. You didn't attempt to make a schedule showing what each town or city should be charged with? A. We did not. That is, the transmission lines we did not; the meters, etc., we did. The list was given us for Harrisonville; we did take the transformers for Harrisonville, but the transmission line we did not. . . .

"Q. Did you figure the cost, as set down in your report, on all items in a sliding scale of the difference in value from the date they were purchased and the present date? A. Only on the transmission and distribution equipment.

"Q. How about the equipment in the power house? A. That was taken from their books.

"Q. What depreciation did you charge off? A. I couldn't tell you without looking at it. (Examines). Structures, we charged three per cent. Do you want each one of them?

"Q. Well, not so much that, but is it a reasonable depreciation? A. It is.

"Q. What is recommended by the Utility Commission, the scale they give? . A. As near as to our knowledge, yes. It is along the same line that we use in all our valuation work, based on the age and condition of the equipment. . . .

"Q. In making your estimate there, did you put down anything in Harrisonville for investment at all? A. No, sir, not except these items of meters and transformers.

"Q. Well, did you have working up the business? Can you look there and tell us whether you did have establishing the business? A. That is based on the valuation of the property outside of Harrisonville.

"Q. And you did, for Harrisonville and all the rest, as to the establishment of the business, you put down how much for that? For the establishment of the business? A. We didn't consider Harrisonville in that.

"Q. How much did you put down for all the business together? A. I think we put $40,000.

"Q. As a matter of fact, the reason you didn't put anything against Harrisonville, you knew they already had an established business; you walked right in and took it without establishing it? A. We didn't consider Harrisonville in this matter at all.

"Q. Then the $40,000 was on the plant outside that you did establish? A. It was on the basis of the valuation of the plant.

"Q. As I understand you to say, this $40,000 you charge as a debt for establishing business in these different localities? A. No, you couldn't call it a debt. You might call it that, but it is an amount we put in that we consider the plant is worth more as a going concern than as a new business.

"Q. In other words, the Commission would use that as a debt instead of part of the business? A. Use it as a part of the capital. . . .

"Q. Mr. Lambert, is there any difference in the cost of a kilowatt of electricty generated or produced in Pleasant Hill at the switchboard in Pleasant Hill and delivered in Harrisonville? A. There is a difference in the cost in the loss of transmission, that is, only part of that which you produce at Pleasant Hill is delivered at Harrisonville; wherefore, the cost of that sold is greater than the cost of that produced.

"Q. The cost is greater where? A. At Harrisonville.

"Q. Does the distance from the plant have anything to do with the cost of delivery of electricity? A. It does.

"Q. Are you familiar with the custom of transmission plants where they serve more than one town or city, the same plant? A. I have known of several systems of that kind.

"Q. Do you know how they make their rates; whether they make a rate for each individual town served or have a uniform rate? A. That varies with different systems. I know some that do one way, and some that do others. . . .

"Q. In estimating your distribution systems, Mr. Lambert, the price of what period did you apply in arriving at your unit cost? A. An average of the last three years.

"Q. You arrived at your unit cost by taking an average for the last three years? A. Yes, sir.

"Q. How did you go about getting the value of the distribution systems; you didn't make an inventory of any one town, or did you? A. In separate towns?

"Q. Yes. A. We made an inventory of about five of them and we estimated the balance of them, taking into consideration the number of street lamps, and the number of consumers, the population, and the current consumed."

Accountants for the Commission made an audit of the books and records of the company for the purpose of ascertaining book cost of the properties as at December 31, 1919, and the result of operations for the calendar year of 1919. This audit (necessarily abridged by us) shows plant and equipment devoted to operations, including land, structures, machinery, transmission and distribution lines, street lighting lamps and standards, sundry construction expenses and three municipal plants purchased, to have cost $402,422.12. It further shows a total operating revenue for 1919 of $89,666.74, total operating expenses of $73,232.46, a net profit from operations of $16,434.28, and, after deducting interest charges of $8,141.83 on indebtedness, a net profit of $8,292.45.

The profit and loss account from January 1, 1919, to June 30, 1919, as reflected in an examination made of the company's books by Clinton H. Montgomery & Co., certified public accountants, introduced in evidence by the company, shows a total revenue from light and power of $36,594.50, non-operating revenues of $1100.65, depreciation $10,750, interest charges $4,356.88, operating expenses $21,239.63, net operating revenue $4,604.87, and net profit $1,348.55. This audit further shows a deficit for the year 1917, after charging off $6,656.34 deprecia-

tion, of $2,854.41, and a deficit for 1918, after charging off $15,000 depreciation, of $8,881.27.

On November 12, 1920, the Commission entered an order, effective November 24, 1920, as follows:

"ORDERED: 1.. That the Green Light & Power Company be and is hereby permitted to file for approval of this Commission, schedules of rates containing as its maximum rates applying to Pleasant Hill, Lee's Summit, Harrisonville, and Holden 13½ cents per kilowatt-hour, and as a maximum rate applying to all the other cities and towns herein affected, 14½ cents per kilowatt-hour, and charges for street lighting on the basis of $1.75 per 60-watt lamp per month, all night schedule, the schedules to be so scaled that by applying said schedules to the service furnished during the year 1919 to the cities affected herein, the annual revenue would be increased $11,500, the street lighting service to the city of Harrisonville to be taken into account when building up the schedules of rates, but the matter of charging for the street lighting furnished to that city to be held in abeyance as stated in the Commission's opinion herein.

"ORDERED: 2. That any and all increases of rates and charges herein authorized or permitted shall remain in effect for a period of thirteen months only from and after the effective date of this order, at the end of which period of thirteen months such increases of rates and charges of said Green Light & Power Company for the service herein described shall be reduced and restored by said Company to the rates and charges now on file and charged by said company: Provided, that the Commission may hereafter by further order continue such increase of rates and charges for another or further period, or otherwise change or modify the rates and charges of said company.

"ORDERED: 3. That the Green Light & Power Company be required to keep a full and accurate account

291 Mo. Sup.—29.

of all the revenues and expenses of the plant and file with this Commission on or before the 5th day of December, 1921, a full and complete certified report thereof, which said report shall cover the operation of the electric business for the year ending November 24, 1921, under the increased rates and charges as herein authorized, and shall be in addition to any other reports required by law; and that the Commission fully retain jurisdiction of the parties and subject-matter hereof, to continue, change or modify the rates and charges of said Green Light & Power Company at any time after the effective date of this order.''

After the overruling of its motion for a rehearing, the city sued out a writ of *certiorari* in the Circuit Court of Cass County. Subsequently the cause was taken on change of venue to the Circuit Court of Henry County, where it was tried on the record, evidence and exhibits introduced before the Commission. In rendering judgment the court prepared and filed a written opinion which is before us in an additional abstract of the record on behalf of the city.

The foregoing outlines the case made.

I. Appellant Public Service Commission contends that the court erred in holding that the lease contract between the company and the city was one not subject to the police power of the State. As stated on behalf of appellant Green Light & Power Company, the insistence is that the power of the Commission to prescribe reasonable rates cannot be abrogated or staved by municipal ordinances or franchise contracts. Substantially both contentions are the same, both being to the effect that the Commission has power to establish rates for the city of Harrisonville, different from or in excess of those prescribed by the lease. This proposition has heretofore been well settled by this court and is no longer debatable. In State ex rel. City of Sedalia v. Public Service Commission, 275 Mo. 201, where the Commission had raised water rates in

excess of those established by an ordinance of the city, which ordinance had been duly accepted by the water company, it was held that the Legislature cannot authorize a municipal corporation and a public service corporation to make a contract which will preclude the sovereign power of the State from fixing reasonable rates irrespective of the contract. At page 211, GRAVES, J., in delivering the opinion for Division One of the court, said:

"It is, however, clear that under our Section 5 of Article 12 of the Constitution of 1875 (a section not theretofore found in our Constitution) the Legislature itself cannot abridge the police power of the State. Nor can it authorize a municipal corporation to make a contract abridging or limiting such police power. So that if, as we have held, the fixing of rates for public service is an exercise of the police power, then under other rulings cited above the Public Service Commission had a right to fix reasonable rates irrespective of the alleged contract. The great weight of authority so holds. Cases from a great number of states will be found in the briefs for the Public Service Commission. These discuss the question from different angles, but reach the same conclusion. We have preferred to rest the ruling in this case upon what this court has previously ruled, which rulings have been in the light of our own peculiar constitutional provision. Under it the sovereign police power of the State is preserved intact, irrespective of contracts with reference to rates for public service. Under it no contract as to rates will stand as against the order of the Public Service Commission for reasonable rates, whether such reasonable rates be lower or higher than the contract rate. Under the Constitution and the Public Service Commission Act the Public Service Commission (supervised by the courts as to the reasonableness of rates) is exercising the police power of the State by its delegated authority from the Legislature. Its rates therefore constitutionally and legally supersede any and all contract rates."

To the same effect was City of Fulton v. Public Service Commission, 275 Mo. 67, involving telephone

charges exceeding maximums prescribed in a franchise granted by city ordinance.

Again, in Kansas City Bolt & Nut Company v. Kansas City Light & Power Company, 275 Mo. 529, where the light company agreed to supply electric energy to plaintiff for a designated time at designated rates, and higher rates were subsequently fixed by the Commission, it was held by this court *en banc* that the rate-making power of the State cannot be abridged by contract between a public service corporation and a private manufacturing corporation.

These pronouncements are clearly decisive of the question here presented. We therefore rule that the Commission had the power to establish rates for the City of Harrisonville higher than those prescribed by the lease, provided such rates were reasonable. The question of reasonableness we shall discuss in the paragraph following.

II. Appellants urge that the court erred in holding that the evidence was insufficient to show that **Reasonable Rates.** the return of the company on the investment necessary to furnish current at Harrisonville was inadequate.

The record before us shows, without contradiction, that the plant of the company was operated as an entirety, without regard to a fixed portion of the investment being charged to Harrisonville; that in 1920 the company was paying greatly increased prices for coal, oil and all electrical supplies; that wages had advanced materially; that after charging off depreciation the company had sustained a loss of $2854.41 for the year 1917, and of $8,881.-27 for the year 1918; that according to an audit made by accountants for the company it had earned from January 1, 1919, to June 30, 1919, but $1348.55, after paying operating expenses and interest and allowing for depreciation; and that according to an audit made by accountants for the Commission, after payment of operating expenses and interest and allowing for depreciation, the company's

net profit was but $8,292.45 for the entire year of 1919. The book cost of the property devoted to operations, as established by accountants for the Commission, without allowance for any going value, was $402,422.12, the reproduction cost was $412,730.80, and the net depreciated cost was $382,442.05.

The report of the Commission as to its findings and conclusions, adopted as a basis for the order made, was as follows:

"Taking the net depreciated value of the plant as shown by the books and allowing ten per cent of the original cost for development cost, or $40,200, and one-eighth of the operating revenue, or $11,200, as working capital, the value of the plant on which the company should be allowed to earn would be about $409,000. . . .

"It appears that a fair value of the property for the purpose of this case would be $409,000, and that will be used as a tentative value. On that value the company had from the year's operation for depreciation and return about 9.6 per cent. It is understood that the towns of Kingsville, Strasburg and Raytown were not connected to the system until after June 30, 1919. Had they been served the entire year of 1919 it is estimated the revenues would have been about $1500 greater than the amount shown above. The expenses would have been some greater also. However, allowing the company seven per cent for return on the value of $409,000, and $5\frac{1}{4}$ per cent for depreciation on $409,000, less the amount of $40,200 allowed for development cost and $11,200 allowed for working capital, the revenues should be $47,474 more than the expenses. The net income for the year 1919, being $39,508, shows that the rates lacked by $7,965 producing a full return. The company showed that since 1919 it had been required to give increases in salary and is now paying more for coal, which increases will probably increase the operating expenses from five to ten thousand dollars more per year. However, the case will be taken on the basis of 1919 operation, with the present price of coal taken into consideration, and the company given rates

454    SUPREME COURT OF MISSOURI,

State ex rel. Harrisonville v. Public Serv. Commission.

that will produce an increase in revenue of about $11,500 per annum when applied to the current sold during 1919 to the cities affected herein.''

Our statute (Sec. 10534, R. S. 1919) expressly provides that all rates fixed by the Commission shall be prima-facie lawful. It follows that they are presumed to be reasonable. In addition, the statute, (Sec. 10535, R. S. 1919) places the burden of proving, by clear and satisfactory evidence, that the rates complained of are unreasonable or unlawful, upon the party seeking to annul or set the same aside. Hence, the burden of proof here being upon the city, it became incumbent upon it to show that the rates fixed by the Commission were unreasonable or unlawful. With respect to any evidence that the rates established were unreasonable, the record is silent. That the action taken was not unlawful in view of the existing lease contract, we have demonstrated in the paragraph above. That the Commission has the power to fix rates, leaving aside the question of any outstanding contract, has been so well settled as to leave no room for controversy.

As to what constituted a reasonable rate, was, as said by WALKER, J., in speaking for this court *en banc* in State ex rel. Southwestern Bell Tel. Co. v. Public Service Commission, 233 S. W. l. c. 431, ''a question of fact calling for the exercise of the common sense and sound judgment of the Commission, which is not bound by any hard-and-fast rule.'' On the fair value of the property, held by the Commission to be $409,000, it is apparent from the audit of operating revenues and expenses for the year 1919, that the net profit of $16,434.28 realized by the company from operations was but a trifle over four per cent, which can scarcely be called an adequate return. Accordingly, when the Commission established rates which would produce an increase in revenue of $11,500, or, by adding such increase to the profit from operations for 1919, a return of approximately 6.83 per cent on the fair value of the property, we are not prepared to substitute our judgment for that of the Commission and say

that such rates were unreasonable. To the contrary, our latest ruling in the rate case affecting the Southwestern Bell Telephone Company (233 S. W. 425, 1. c. 432), approved a return almost identical, the same there being 6.81 per cent upon the property as valued by the Commission.

We therefore allow the claim of error urged by appellants.

III.    Appellants finally contend that the court erred in holding that the Commission was without authority to divide the cities and towns served into two groups and to charge the same rate for each city or town in the particular group.

Rates According to Classified Groups.

Under the order of the Commission the rate of 13½ cents per kilowatt-hour established, applied to the city of Harrisonville and to Pleasant Hill, Lee's Summit and Holden, the most populous of the cities served. The rate of 14½ cents per kilowatt-hour applied to all the other cities and towns affected.

The uncontroverted evidence shows that it was impractical and indeterminable for a fixed portion of the expense of production of current at the central plant to be charged against the various towns, for the reason that the quantity of current used and the number of customers served continually varied. The uncontradicted evidence further shows that the greater the distance of a town from the producing plant, the greater the cost of current delivered, owing to loss in transmission. On cross-examination of the witness Green, counsel for Harrisonville brought out the fact that it cost more per customer "to furnish a small town than it does a large one."

The Commission in its report has in part the following to say with respect to the rates to be charged:

"Having determined the amount of increase in revenue the company should have, the next problem is to determine the just and fair maximum rates that should exist in each city or town. In this instance several com-

plications enter into the problem. Each of the cities and towns represented claimed certain rights and privileges due to the franchise under which the company operated in that particular locality, and stated that the rates when fixed by the contract should continue. The power of the Commission to change franchise rates has been so well settled that it is not necessary to dwell on the question here. Another question dwelt upon extensively in the case is that concerning the allocation of the property used to serve some particular city or town. Some seemed to think that if a transmission line existed, serving particular cities, and a spur was built from the existing line to serve a new city, the new city should not be required to share a part of the burden of the existing line.

"Another point to be considered in this case is the adjudication of the agreement between the city of Harrisonville and the company, or any contract between the company and any of its customers, that might give one customer or class of customers undue advantages that others might not enjoy.

"The fundamental or basic principle on which to fix rates is that one which will take into account both the operating expenses and the hours-use of the equipment set aside to furnish the service. Proper consideration of the first item will cause each customer to pay his portion of the coal, labor and running costs, while consideration of the second item will cause each customer to pay his portion of the fixed costs on the investment made to render the service. It is due mostly to the latter point in question that there is required a classification of the customer to avoid discriminatory rates. As an example, a customer using a one-horse-power motor ten hours per day will need to pay only one-tenth as much per hour that the motor is used as a customer using a motor one hour per day to pay a fixed sum of so much per year to cover the interest and depreciation charges on the machinery and lines built to furnish the service.

"Now discussing the lay-out of the system from a physical and geographical standpoint the three cities

Lee's Summit, Holden and Harrisonville are situated at the vertices of an almost equilateral triangle, with the city of Pleasant Hill practically at the intersection of the three medians or center of the triangle. From Pleasant Hill, where the power plant is located, three transmission lines, hereafter called main transmission lines, are built to the three other cities just named. Then from the main transmission lines spur transmission lines are built to serve practically all other cities and towns involved in the case. So the main transmission lines from Pleasant Hill to the three cities named may be taken and property used to serve all the cities and towns the same as the power house.''

Further discussing the cities of Harrisonville, Pleasant Hill, Lee's Summit and Holden, the Commission says:

''These four towns, because of the population, location, number of customers and such, justify placing them in one group. Generally speaking the larger a town becomes the longer hours-use it makes of the electric system per day, and that as stated above is one of the two determining factors in rate making.''

The reasoning of the Commission seems to us to be sound. However, we are not concerned with the expediency or wisdom of the order made.. The findings of the Commission are by statute made prima-facie **Wisdom of** lawful, and we will ascribe to them the **Commission.** strength due to a judgment of a tribunal created by the Legislature and informed by experience. While the conclusion reached is subject to review, nevertheless, if the power of the Commission has not been arbitrarily exercised, or rates established which are unreasonable, and if the order made is not violative of the Constitution, or wanting in conformity to statutory authority, and is supported by substantial evidence, we accept it as final. We are of the opinion that the order here present is in conformity with the law, is supported by the evidence, and is not subject to just criticism.

For the reasons appearing herein, the judgment of the circuit court setting aside the findings and orders of the Public Service Commission should be reversed.

It is so ordered. *James T. Blair, C. J., Woodson Graves* and *Walker, JJ.,* concur; *Higbee, J.,* dissents, in a separate opinion; *David E. Blair, J.,* not sitting.

HIGBEE, J. (dissenting).—The contract entered into between the Green Light & Power Company and the city of Harrisonville contained a schedule of rates to be charged by the company for residence and business houses, during the term of the lease. This contract was submitted to the people of the city of Harrisonville at an election held August 16, 1918, and the same was ratified by a majority of the citizens voting, as stated in the majority opinion.

We are of the opinion that the evidence demonstrates that no emergency existed justifying the Commission in abrogating the contracts entered into by the company with the city, notwithstanding the fact that by Section 10535, Revised Statutes 1919, the burden of proof in these proceedings is on relator.

The right of private contract is safeguarded by our State and Federal constitutions. There is no question here of the State confiscating the company's property. The State, under its police power, may not increase the rates fixed by the contracts in order that the company may have a reasonable income from its investment and pay dividends to its stockholders. It can only do that, if it can in any case relieve against a contract, when it is clearly shown that the public welfare demands it in the specific case.

The company asked the Commission to increase its rates to meet the increased cost of fuel, taxes and wages. The purpose is clearly avowed. It would have the Commission obligingly rewrite the contracts with its patrons, so as to shift this increase in the burden it has solemnly agreed to carry onto the shoulders of the other parties to the contracts, and so enable the company to earn its former profits.

State ex rel. Harrisonville v. Public Serv. Commission.

There was no finding, nor was there any evidence justify a finding, that the company could not continue to perform its functions. The burden was on the company to prove that an emergency existed justifying an increase in the rates the parties had contracted should be paid. On the contrary, the evidence demonstrates that there was no emergency.

In Louisana v. Louisana Water Co., P. U. R. 1918 B, 774, 1. c. 778, our Commission said: "While, as above stated, we hold the Commission possessed the requisite power, yet it is undoubtedly true that increasing the rates above the price at which a company solmenly agreed to furnish its commodity, and in return for which it received a permit to use the streets and a practical monopoly of the business, should not be done lightly, or unless the public interest is threatened in some way if the existing rates are allowed to continue. It is entirely from this standpoint of the public interest that state regulations of public utilities has been attempted."

In Southern Iowa Electric Co. v. City of Chariton, 41 S. C. 400, the late Chief Justice WHITE delivering the opinion of the court, said: "Two propositions are indisputable: (a) that although the governmental agencies having authority to deal with the subject may fix and enforce reasonable rates to be paid public utility corporations for the services by them rendered, that power does not include the right to fix rates which are so low as to be confiscatory of the property of such corporations [citing cases]; and (b) that where, however, the public service corporations and the governmental agencies dealing with them have power to contract as to rates, and exert that power by fixing by contract to govern during a particular time, the enforcement of such rates is controlled by the obligation resulting from the contract, and therefore the question of whether such rates are confiscatory becomes immaterial" (citing cases).

The citizens of Harrisonville contend that the order of the Commission is a violation of the terms of their contract and a confiscation of their property without

compensation in contravention of the guarantees of the Federal Constitution. The agreed facts bring this case within the second proposition stated by the learned Chief Justice. This is a federal question, and that decision is controlling.

The company and the citizens of Harrisonville voluntarily entered into a contract fixing the rates to be paid by them for current to be furnished by the company at certain stipulated rates. Confiscation implies the taking of property against one's will without just compensation. Insistence upon the performance of a lawful contract voluntarily entered into cannot be viewed as confiscation. This case differs from State ex rel. v. Pub. Serv. Comm., 275 Mo. 201. In that case the State, representing the municipality, consented to change the stipulated rates.

In Pawhuska v. Pawhuska Oil Co., 250 U. S. 394, Mr. Justice VANDEVENTER quoted from New Orleans v. N. O. Water Works Co., 142 U. S. 79, as follows: "In this case the city has no more right to claim immunity for its contract with the Water Works Company, than it would have had if such contract had been made directly with the State. The State, having authorized such contract, might revoke or modify it at its pleasure."

The contract from which the company seeks to escape is not one entered into with the city of Harrisonville in its corporate capacity, as in State ex rel. City of Sedalia v. Pub. Serv. Comm., 275 Mo. 201, but is a private contract between the company and the citizens of Harrisonville for lighting their private residences and business houses, and is protected by our state and federal constitutions. It may be, as contended, that the company is not making its customary profits and will not be liable to declare its usual dividends unless the rates stipulated in the contract are increased, but, unfortunately, that is true in all lines of business. That fact, however, does not authorize the Public Service Commission to rewrite the private contract solemnly entered into between the contracting parties and insert therein terms not agreed to by the citizens of Harrisonville. I therefore respectfully dissent from the majority opinion.